[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 614 
Jeffrey Alan Cox was indicted and convicted for the capital murder of his grandparents. Alabama Code 1975, § 13A-5-40
(a)(10). Cox waived his right to the participation of the jury in the sentence proceeding as authorized by § 13A-5-44, upon the pretrial stipulation of both the prosecution and the defense that there were no aggravating circumstances. The trial judge sentenced Cox to life imprisonment without parole.
 I
The trial judge's refusal to give the defendant's requested charges instructing the jury that manslaughter was a lesser included offense was not error.
The trial judge charged on capital murder, wherein two or more persons are murdered by the defendant as charged in the indictment, and on non-capital murder as a lesser included offense of capital murder. Cox argues that "the evidence offered by the defendant was to the effect that he was not responsible for his actions, which were the product of an irresistible impulse. This and other evidence would if believed tend to negate the specific intent requisite to a charge of capital murder." Appellant's Brief, p. 60. In this case, the charges were properly refused.
"[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility." Chavers v. State,361 So.2d 1106, 1107 (Ala. 1978). "A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury." Chavers, 361 So.2d at 1107. Here, the evidence would not support a conviction for manslaughter or criminally negligent homicide.
It is undisputed that the defendant shot and killed his grandparents. The only issue was whether he acted intentionally or whether he lacked criminal responsibility for his actions because of a mental disease or defect. "A person acts intentionally with respect to a result or to conduct . . ., when his purpose is to cause that result or to engage in that conduct." Alabama Code 1975, § 13A-2-2 (1). "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." § 13A-3-1 (a).
There is no evidence that the defendant acted recklessly or with criminal negligence as those terms are defined by §13A-2-2 (3) and (4). There is also no evidence that he acted in the sudden heat of passion. Consequently, there is no evidence to support a finding that the defendant is guilty of manslaughter or criminally negligent homicide. See § 13A-6-3
and § 13A-6-4. Under the evidence at trial and the theories under which the case was tried, the defendant was either guilty of an intentional killing, which meant that he could only be guilty of either capital murder or simple murder, or he was not guilty of any offense by reason of insanity. The evidence allowed no middle ground. George v. State, 240 Ala. 632, 638,200 So. 602, 607 (1941). Instructions on manslaughter and criminally negligent homicide would only have tended to foster a compromise verdict which the law does not approve or contemplate. Edwards v. State, 33 Ala. App. 386, 387,34 So.2d 173, 174 (1948). "A defendant is not entitled to instructions on lesser-included offenses, where his confession of the act charged was admitted, and he relied on evidence of insanity."Strong v. State, 52 Ala. App. 237, 243, 291 So.2d 325, 331
(1974). The requested instructions on the lesser included *Page 616 
offenses of the crime of intentional murder were properly refused.
 II
The defendant argues that his confessions were improperly admitted into evidence for three reasons. We disagree on each ground.
Initially, the defendant argues that the State's burden should be to prove the voluntariness of a confession beyond a reasonable doubt and to a moral certainty and not merely by a preponderance of the evidence. The Constitution of the United States only requires that, before a confession is admitted into evidence, its voluntariness must be proven by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489,92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972). This is the standard which has been adopted in this state. "Before a confession is admissible, the trial judge must be satisfied by a preponderance of the evidence that it was voluntarily made." Exparte Singleton, 465 So.2d 443, 445 (Ala. 1985). In light of our Supreme Court's holding in Singleton, which we are bound to follow, we reject Cox's plea that we adopt the "more enlightened" rule that the voluntariness of a confession must be proven beyond a reasonable doubt.
 III
The defendant also contends that, at the time he was taken into custody, there existed no probable cause for his arrest, and his confessions were obtained in violation of the Fourth Amendment of the Constitution of the United States.
Near midnight on the 29th of November, 1982, the Marion County Sheriff's Office received a telephone call from someone at the residence of Jim Cox (the defendant's father) reporting a shooting at the home of Archie and Lottie Cox (the defendant's grandparents). Sheriff Floyd Long was dispatched to the residence of Jim Cox to talk to the defendant, who had discovered the bodies of Archie and Lottie Cox.
Sheriff Long arrived at the defendant's father's house and, together with the Marion County District Attorney, Alvis E. Tidwell, questioned the defendant about the murders in the presence of the defendant's father and his stepmother. The defendant, who had been living with his grandparents, stated that he had been off hunting and had returned to find that his grandparents had been shot and killed. After discovering the bodies, the defendant drove his grandfather's truck to his father's house to report the crime. This initial questioning of the defendant lasted about fifteen minutes.
At the request of the Sheriff and the District Attorney, the defendant consented to return to his grandparents' home. At trial, the Sheriff testified that the defendant said he would "be glad to go." Prior to leaving, the Sheriff asked the defendant if he had "anything on him." The defendant indicated that he had some .22 caliber shells and gave them to the Sheriff and told him that there was a .22 caliber rifle in the truck. The Sheriff testified that suspicion had "not really" centered on the defendant: "We were still investigating, trying to find out what happened and get a story or statement from him."
Sheriff Long testified that, while en route to the victims' house, the defendant sat in the front seat of the Sheriff's car, and that he again asked the defendant "what had happened, to tell us what he found and what happened up there." The defendant repeated his story that "he had been off hunting by himself, come in and found his grandparents shot." Sheriff Long testified that he asked the defendant "if he wasn't telling me the truth" and told him that he "wished he would tell me what happened if he knew anything about it."
When the Sheriff, the District Attorney, and the defendant arrived at the grandparents' house, the Sheriff asked the defendant "if he wouldn't mind to stay in the car and let me go inside and see what happened myself." The Sheriff's car was "just a regular sedan." According to Sheriff Long, the defendant "just agreed to *Page 617 
stay there." Sheriff Long then asked Deputy Max Brasher to watch the defendant, but no one remained at the car, although there was always an officer within sight. Hamilton Police Officer Danny Ballard testified, "We were keeping an eye on him."
Sheriff Long was a licensed mortician. He observed the bodies and concluded that they had been shot multiple times with what "appeared to be a .22 caliber-type weapon." He observed no evidence of forced entry. The Sheriff noticed that "in one of the rooms, looked like there might have been some drawers pulled out and rumpled, but not a fight or anything." The Sheriff noticed that the shells the defendant had given him earlier "looked to be the same kind" as those found at the scene. The Sheriff remained at the scene for approximately thirty minutes.
After his investigation inside the house, Sheriff Long returned to his car and informed the defendant that they needed a statement from him and that, because of the time, the "only logical place" to go was to the visiting room area of the county jail. This was discussed with the defendant who agreed to go with the Sheriff to give a statement. Sheriff Long testified that the defendant was not in custody or under arrest. The Sheriff also stated that "[a]t that time, I didn't think his story, you know, matched my thinking on what had happened."
On the way to the jail, the Sheriff asked the defendant "again. . . ., what had happened because as the night progressed I was not believing his story." The Sheriff asked the defendant "at least twice, . . . maybe three times." On each occasion, the defendant repeated his account of having returned from hunting and having found his grandparents' bodies.
District Attorney Investigator C.J. Cox met the District Attorney and the Sheriff at the county jail and all three men questioned the defendant. The other grandson of the decedents had been questioned at the jail before the defendant. The defendant waived his Miranda rights and then repeated his story about returning home from hunting and finding his grandparents. Sheriff Long told the defendant he did not believe his story and informed him that he needed to tell the truth. The defendant, however, maintained the same story, with the exception of stating that he had gone trapping instead of hunting.
When Investigator Cox, Sheriff Long, and District Attorney Tidwell took a break from the questioning, they left the defendant unattended in the room. Before they left, the Sheriff told the defendant not to leave the room. During their break, the law enforcement officers decided that a one-on-one approach might be more effective, so Investigator Cox alone resumed the interrogation of the defendant. It was during this interview with Investigator Cox that the defendant admitted shooting his grandparents. Sometime after this confession had been obtained, Sheriff Long told the defendant he was under arrest.
At the hearing on the motion to suppress, the defendant testified that when Sheriff Long asked him if he would go to his grandparents' house, he "got up and started walking toward him to go out the door with them." The defendant stated that, at his grandparents' house, he was "told to stay in the car." He started to get out once but was told to stay in the car by someone he knew as Jamie but he did not know whether or not Jamie was an officer. He did not recall Sheriff Long asking him if he would go to the jail to give a statement. On the way to the jail, the defendant rode in the front seat of the Sheriff's car.
The defendant argues that he was placed in custody when he was "instructed" to get into the Sheriff's car at his father's house, that there was no probable cause to arrest him at that time, and that therefore he was illegally detained and any statement he made was the fruit of that illegal detention.
Absent probable cause or judicial authorization, the Fourth Amendment prohibits the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, *Page 618 
which includes interrogation. Hayes v. Florida, 470 U.S. 811,105 S.Ct. 1643, 1647, 84 L.Ed.2d 705, 710 (1985). In order to be admissible into evidence, a confession must satisfy the requirements of both the Fourth and Fifth Amendments to the Constitution of the United States. Dunaway v. New York,442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A confession must be voluntary, both in the sense that it was not the product of an illegal detention, Dunaway, Taylor v.Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), and in the sense that it was obtained only after an intelligent, knowing, and voluntary waiver of constitutional rights. Miranda. A confession which is voluntary for purposes of the Fifth Amendment under Miranda does not necessarily satisfy the voluntariness requirement of the Fourth Amendment that the confession was not obtained by exploitation of the illegality of an arrest. Dunaway, 442 U.S. at 217,99 S.Ct. at 2259, 60 L.Ed.2d at 838-39; Brown v. Illinois, 422 U.S. 590,95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Fifth Amendment voluntariness is "merely a `threshold requirement' for Fourth Amendment analysis." Dunaway, 442 U.S. at 217,99 S.Ct. at 2259, 60 L.Ed.2d at 839. "[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." Florida v.Royer, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229,238 (1983). "[R]easonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." Royer, 460 U.S. at 499, 103 S.Ct. at 1325,75 L.Ed.2d at 237.
The primary issue we must decide is whether the defendant was unlawfully seized before his admission of the killings. Analysis of this issue involves deciding (1) was the defendant seized, and if so at what point; and (2) if the defendant was seized, was there probable cause for his detention. UnitedStates v. Black, 675 F.2d 129, 132 (7th Cir. 1982), cert. denied, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).
In order to determine whether or not the defendant was seized, a "seizure" must be defined. Not every encounter between an individual and a police officer constitutes a seizure. INS v. Delgado, 466 U.S. 210, ___, 104 S.Ct. 1758,1762, 80 L.Ed.2d 247, 254 (1984); Florida v. Royer,460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983);United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870,1877, 64 L.Ed.2d 497, 509 (1980); United States v.Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116
(1976). There is no "litmus-paper test for distinguishing a consensual encounter from a seizure." Royer, 460 U.S. at 506,103 S.Ct. at 1329, 75 L.Ed.2d at 242. Although the Supreme Court of the United States has failed to clearly define a seizure, a majority of that court has adopted the standard initially stated in Mendenhall, 446 U.S. at 553-54,100 S.Ct. at 1877, 64 L.Ed.2d at 509, that a person "is `seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. * * * [A] person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." See Delgado, 466 U.S. at ___, 104 S.Ct. at 1769,80 L.Ed.2d at 263 (Brennan, J., concurring in part and dissenting in part).
The Fourth Amendment does not involve consensual conduct."Dunaway, of course, does not change the rule that a voluntary trip to the police station for questioning does not implicate the fourth amendment." United States v. Webster, 750 F.2d 307,321 (5th Cir. 1984), cert. denied, ___ U.S. ___,105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). One "category of police-citizen encounter is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through noncoercive questioning; this type of contact does not rise to the level of a seizure." Black, *Page 619 
675 F.2d at 133 (7th Cir. 1982). See also United States v.Puglisi, 723 F.2d 779, 783 (11th Cir. 1984).
The question of whether consent to questioning was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances. Mendenhall, 446 U.S. at 557, 100 S.Ct. at 1879,64 L.Ed.2d at 511; Schneckloth v. Bustamonte, 412 U.S. 218,227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854, 862-63 (1973). The State has the burden of proving consent. Bumper v. NorthCarolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792,20 L.Ed.2d 797, 802 (1968). The State "cannot discharge its burden of demonstrating consent to what would otherwise constitute a full-blown seizure by demonstrating uninformed consent to what a reasonable person would consider an innocuous exchange."Webster, 750 F.2d at 322 (officer's silence about true nature of defendant's trip to sheriff's office with him vitiated defendant's consent to custodial interrogation). Also, a mere submission to a claim of lawful authority does not show a valid consent to custody. Royer, 460 U.S. at 497, 103 S.Ct. at 1324,75 L.Ed.2d at 236. However, the Constitution does not require proof of knowledge of the right to refuse to cooperate with the police as a prerequisite to a valid consent, although such knowledge is highly relevant in making a determination that consent was given. Mendenhall, 446 U.S. at 555,100 S.Ct. at 1878, 64 L.Ed.2d at 510. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. . . . Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." Delgado, 466 U.S. at ___, 104 S.Ct. at 1762-63,80 L.Ed.2d at 255.
On the basis of the facts before us, we conclude that the defendant was not seized until after the Sheriff had returned from investigating the scene of the crime. We find the defendant voluntarily went with the Sheriff to the scene of the crime and once there agreed to remain inside the Sheriff's car voluntarily in a spirit of apparent cooperation with the officer's investigation rather than in "submission to a show of force or authority which left him no choice." Sibron v. NewYork, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935
(1968).
This conclusion hinges on several specific facts considered in context within the totality of the circumstances. It was the defendant who announced to his father that he had discovered the bodies of his grandparents. The initial report to the police was made either by the defendant himself or by someone else at the home of the defendant's father. The defendant was initially questioned at his father's house in the presence of his father and his stepmother. The defendant was initially questioned as a potential witness and was not considered a suspect. People v. Holloway, 131 Ill. App.3d 290, 86 Ill.Dec. 536, 475 N.E.2d 915 (1985); People v. Herron, 89 Ill. App.3d 1048, 45 Ill.Dec. 641, 412 N.E.2d 1365 (1980), cert. denied,454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 614 (1981). The defendant admittedly agreed to return to the scene of the murders. Only after the defendant had agreed to remain in the Sheriff's car did the Sheriff tell a deputy to "watch" him. The defendant agreed to go to the county jail to give a statement after the matter was discussed with him. The State's evidence shows that he knowingly, intelligently, and voluntarily waived his Miranda rights and did, in fact, give a statement.
Sheriff Long's directions to "watch" the defendant are significant. However, they are no more controlling than the officer's statement in Barfield v. Alabama, 552 F.2d 1114 (5th Cir. 1977). There, an officer allegedly told the accused, who had voluntarily gone to the police station, that she could not leave. The court held: *Page 620 
 "The force and effect of such a statement, assuming it was made, is diminished by the fact that Barfield was left alone, her departure unimpeded by physical restraints or the presence of other officers. When viewed in that light, Gray's alleged statement to Barfield that she remain in the office seems more in the nature of a precatory request than a command. See United States v. Brunson, 549 F.2d 348, 357 nn. 12 
13 (5th Cir. 1977)." Barfield, 552 F.2d at 1118.
Here, the force and effect of the Sheriff's statement were diminished by the fact that the defendant had previously agreed to remain in the car and subsequently agreed to go to the jail to give a statement. Additionally, we note that it was only after the Sheriff had personally investigated the crime scene that he began to suspect the defendant of any criminal activity. Prior to this, it appears that the defendant was the only witness the Sheriff had.
Also, it must be noted that a double homicide had just been discovered. Having the defendant voluntarily accompany the Sheriff to the scene of the crime and wait while he conducted a brief investigation would facilitate and speed that investigation. The defendant had discovered the bodies and was the only person still alive who had been living in the grandparents' house. While the record does not show why the Sheriff asked a deputy to "watch" the defendant, even this request was reasonable to prevent the defendant, who had already agreed to remain in the car, from possibly unintentionally contaminating the sight of the murder investigation. Certainly, this brief detention of the defendant was not unreasonable. See Baxter v. State, 274 Ark. 539,626 S.W.2d 935, cert. denied, 457 U.S. 1118, 102 S.Ct. 2930,73 L.Ed.2d 1331 (1982); Keeton v. State, 427 So.2d 231
(Fla.Dist.Ct.App. 1983); W. LaFave, 3 Search and Seizure § 9.2 (b) (1978).
Even if this Court were to find that the State did not prove that the defendant consented to accompany the Sheriff to the jail to give a statement, the defendant's confession still would have been properly admitted into evidence.
It is reasonably certain that, once the Sheriff had completed his investigation, he probably would not have permitted the defendant to leave had the defendant not complied with his request to accompany him to the jail to give a statement. However, at this time, the Sheriff had probable cause to arrest the defendant. The defendant was the only person besides his grandparents to reside at the residence where his grandparents were killed. The defendant discovered the bodies and reported the crime. The murders were committed with a small caliber weapon and .22 caliber shells similar to those the defendant had in his possession were found at the scene. The defendant admitted that he had been hunting and was in possession of a .22 caliber rifle. There was no forced entry into the residence and there appeared to have been no struggle inside. These facts furnished probable cause to believe that the defendant was involved in the murder of his grandparents.
"The test for probable cause is clear: probable cause exists if facts and circumstances within the knowledge of an arresting officer and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an individual has committed a crime." United Statesv. Long, 674 F.2d 848, 853 (11th Cir. 1982).
 "The facts, information and circumstances within the knowledge of the arresting officers need not amount to evidence which would suffice to convict; but the quantum of information which constitutes probable cause — evidence which would warrant a man of reasonable caution in the belief that a felony had been committed — must be measured by the facts of the particular case." Yeager v. State, 281 Ala. 651, 653, 207 So.2d 125, 127 (1967).
See also McCants v. State, 459 So.2d 992, 994 (Ala.Cr.App. 1984). *Page 621 
The fact that the Sheriff testified that the defendant was not under arrest or in custody is not conclusive on that issue. "[T]he mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause." UnitedStates ex rel. Senk v. Brierley, 381 F. Supp. 447, 463 (M.D.Pa. 1974), affirmed, 511 F.2d 1396 (3d Cir. 1975), cert. denied,423 U.S. 843, 96 S.Ct. 77, 46 L.Ed.2d 63 (1975). See alsoUnited States v. Gray, 659 F.2d 1296, 1300 (5th Cir. 1981); 1 W. LaFave, supra, § 3.2 (b) at p. 460-61. "Probable cause is measured against an objective standard. . . . If this objective test is met, it is unnecessary that the officer hold a subjective belief that he has a basis for making the arrest."United States v. Salinas-Calderon, 728 F.2d 1298, 1300-01 (10th Cir. 1984) (citations omitted).
"The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed `to prevent arbitrary and oppressive interference by law enforcement officials with the privacy and personal security of individuals.'" Delgado, 466 U.S. at ___, 104 S.Ct. at 1762, 80 L.Ed.2d at 254. We find that the law enforcement officers' conduct in this case was reasonable and was neither arbitrary nor oppressive, and that the defendant was not subjected to any illegal arrest which would taint and invalidate his confession.
 IV
Finally, the defendant contends that his confessions were the product of coercion and intimidation because Investigator Cox allegedly told him that if he did not tell the truth, "I'll do my damnedest to see you get the electric chair."
Investigator Cox absolutely denied making any such statement and the other witnesses involved in the interrogation denied hearing any similar statement made. The defendant was the only witness to testify that the statement was made. This conflict created a question of credibility only the trial judge could resolve.
 "The standards for appellate review of a trial judge's determination of the admissibility of a confession are as follows: (1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) `The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375
(Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977) and cases cited therein. `Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978)." Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App. 1983), reversed on other grounds, 461 So.2d 852 (Ala. 1984).
See also Bennett v. State, 409 So.2d 936, 939 (Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968,73 L.Ed.2d 1356 (1982). *Page 622 
 V
The trial judge properly refused to replace the defendant's two appointed trial counsel, Hugh Davis and Bill Fite, because of some unspecified "difference of opinion" between counsel and the defendant because of "certain difficulties" between counsel and the defendant, and because the defendant was "not comfortable" with his attorneys. Attorneys Davis and Fite had been appointed to represent the defendant after the trial judge dismissed prior appointed counsel with whom the defendant and his family had expressed dissatisfaction.
In denying the defendant's motion, the trial judge stated, "Mr. Fite is probably the most experienced criminal lawyer in Marion County and is one of the most experienced criminal lawyers in the State of Alabama." The judge also explained that the defendant needed counsel who would "advise you soundly rather than to agree with you on everything."
"[T]he courts have been unwilling to say that the constitutional right to counsel carries with it the right to demand that a particular attorney be appointed by the court." Annot., 66 A.L.R.3d 996, 999 (1975).
 "A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. A defendant is not entitled to an attorney who agrees with the defendant's personal view of the prevailing law or the equities of the prosecutor's case. A defendant is entitled to an attorney who will consider the defendant's views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics. A defendant is entitled to an appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told. Every defendant is entitled to the assistance of counsel dedicated to the proposition, and capable of assuring that, the prosecution's case shall be presented in conformity with the Constitution, rules of evidence and all other controlling rules and practices. No defendant has a right to more." United States v. Moore, 706 F.2d 538, 540 (5th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983) (emphasis added).
The trial judge did not abuse his discretion in refusing to appoint new counsel to represent the defendant because the defendant did not show any irreconcilable conflict.
 "Denial of a motion for substitution of counsel rests within the discretion of the trial judge. United States v. Davis, 604 F.2d 474 (7th Cir. 1979); United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979). In order to exercise its discretion properly the court must elicit from the defendant the reasons for his objection to counsel, United States v. Seale, 461 F.2d 345 (7th Cir. 1972), or, when counsel makes known a possible conflict of interests, `take adequate steps to ascertain whether the risk [is] too remote to warrant separate counsel.' Holloway v. Arkansas, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978). Unless there is a demonstrated conflict of interests or counsel and defendant are embroiled in an `irreconcilable conflict' that is `so great that it resulted in a total lack of communication preventing an adequate defense,' there is no abuse of discretion in denying a motion for new counsel. United States v. Mills, 597 F.2d at 700; United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973)." United States v. Morris, 714 F.2d 669, 673 (7th Cir. 1983).
 VI
The trial judge did not abuse his discretion in refusing to allow defense counsel to recall State's witness Investigator Cox for further cross examination. Defense counsel sought to contradict and impeach Cox by showing on recall that, contrary to his testimony on cross examination, he had threatened a suspect with a *Page 623 
more severe penalty if he did not cooperate. The record shows that defense counsel was aware of this other incident when Cox was cross examined.
"The trial court generally has the discretion to allow or disallow a witness to be recalled for further direct or cross examination, for the purpose of asking the witness a question that might have been asked him on his original call." C. Gamble, McElroy's Alabama Evidence, § 440.01 (3d ed. 1977). "Absent surprise or some other valid reason, defense counsel should not be permitted to recall a witness for further cross examination or impeachment." Hardy v. State, 455 So.2d 265, 267
(Ala.Cr.App. 1984). Cox's allegedly "corrupt conduct" of threatening suspects with more severe penalties was not "specifically aimed at affecting the present case" and, consequently, was inadmissible to impeach his credibility.McElroy's, § 151.01. We find no abuse of the trial judge's discretion.
 VII
During the State's cross examination of the defendant and in response to one of defense counsel's repeated requests for a mistrial, the trial judge stated, "Denied. But if you keep on making it I'm liable to grant one of them." The defendant alleges that this remark "ridiculed counsel's attempt and made it appear to the jury that our efforts to represent our client were not important and should be disregarded."
Perhaps it might have been more prudent on the part of the trial judge had this remark not been made. Still, we find no error. "Remarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial." McCovery v. State, 365 So.2d 358, 362 (Ala.Cr.App. 1978). "[T]he trial judge is not required to be a robot without emotional reaction to happenings in his courtroom." Fletcher v.State, 291 Ala. 67, 69, 277 So.2d 882 (1973).
 VIII
The defendant argues error in the refusal of ninety-two of his requested charges. Under A.R.A.P., Rule 45B, we do not consider this bare allegation of error, without any supporting argument or citation to legal authority, sufficient to warrant our attention.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.