TYSON, Judge.
The appellant, a seventeen year old, was arrested on January 24, 1985, and charged with the strangulation, beating, and subsequent death of Kammye Lytorcha Huey, in violation of Section 13A-6-2 of the Code of Alabama (1975). On February 1, 1985, the Dallas County District Attorney’s Office filed a petition to have the appellant tried as an adult in the circuit court. On April 16,1985, a hearing was conducted pursuant to that petition, after which the juvenile court entered an order of transfer directing that the appellant be tried as an adult. The appellant appealed this order and this court reversed the ruling and remanded this case for a new transfer hearing; one in which the juvenile court followed Rule 24, A.R.J.P. In the interest of judicial economy, this court also addressed three issues which the appellant presented on the appeal of this transfer order. Taylor v. State, 491 So.2d 1042 (Ala.Cr.App.1986).
In this appeal of a subsequent transfer order from juvenile court to adult criminal court, this court finds that the transfer was in accordance with Section 12-15-34 of the Code of Alabama (1975), and that there was probable cause to believe that the allegations were true. Gulledge v. State, 419 So.2d 219 (Ala.1982); Duncan v. State, 394 So.2d 930, 932 (Ala.1981). The following is the judge’s finding and order of transfer of the appellant from juvenile court to adult criminal court: (R. 459.)
“This matter came before the Court for hearing on a Motion To Transfer, filed in accordance with Section 12-15-34 of the Code of Alabama, (1975). The petition as filed by the District Attorney requested transfer of Samuel Eugene Taylor from the Juvenile Court to the Circuit Court of Dallas County for criminal prosecution as an adult, and this court having heard the evidence, and considered all of the factors required by law as enumerated in Section 12-15-34(d) Code of Alabama, (1975) finds as follows:
“1. That Samuel Eugene Taylor is more than fourteen (14) years of age, and is alleged to have committed an act which would constitute a felony if committed by an adult, namely, intentionally causing the death of another person, Kammye Lytorcha Huey, by strangulation and/or by beating her with a blunt instrument, in violation of Section 13A-6-2 of the Code of Alabama, (1975), against the peace and dignity of the State of Alabama.
“2. That the child is not committable to an institution or agency for the mentally retarded or mentally ill, but in fact has been evaluated by the staff at Taylor Hardin Secure Medical Facility, Alabama State Department of Mental Health and Mental Retardation, Tuscaloosa, Alabama, and such evaluation indicates that Samuel Eugene Taylor is not mentally retarded or mentally ill, and appears sufficiently psychiatrically stable to move forward in the trial process. That the child is not and has not for some time been enrolled as a student in school.
“3. That the child has no prior record except “a child in need of supervision” petition filed by his mother, Mrs. Ethel B. Roper, on July 6, 1982. The matter was disposed of through adjudication by informal adjustment.
“4. That the child is physically mature and has the appearance of one much older than his chronological age. The child is now 19 years of age; he was 17 years of age at the time the crime he is charged with was committed. He stands six feet, 3½ inches tall, and weighs 175 lbs. He appears to be in good health with no physical handicaps. His test results from Taylor *523 Hardin Secure Medical Facility indicate that he does not lack physical or mental maturity for his age.
“5. That the child does not appear to fit the criteria of any treatment facility of probation within the Juvenile Court because of his physical size, his age, his educational background and his emotional maturity.
“6. That is (sic) appears to be in the best interest of the community and of this child to have him transferred to the Circuit Court of Dallas County, Alabama, for criminal prosecution as an adult based on the above findings and the nature of the present offense.
“The Court upon hearing the evidence finds probable cause for believing that the allegations of the petition are true and correct.
“The Court further finds that it is in the best interest of said child and the community to transfer said child to Adult Court for criminal prosecution.
“It is therefore the order of this Court, that said child, Samuel Eugene Taylor, be and he is hereby transferred from the Juvenile Court to the Circuit Court of Dallas County for criminal prosecution as an adult for said offense.”
This order fully meets the requirements of Section 12-15-34, Code of Alabama (1975). It indicates that the court considered the six factors outlined in Section 12-15-34(d)(l)-(6). The Alabama Supreme Court has previously determined that a mere restatement of the factors set out in the statute is sufficient. Spellman v. State, 469 So.2d 695 (Ala.Cr.App.1985); McKinney v. State, 404 So.2d 639 (Ala.1981); Duncan v. State, 394 So.2d 930 (Ala.1981); Brown v. State, 353 So.2d 1384 (Ala.1977). Furthermore, the Court of Criminal Appeals will not interfere with the lower court’s order transferring a juvenile to circuit court for criminal prosecution unless such order is clearly erroneous. Spellman v. State.
In this appeal, the appellant also asserts four issues, three of which have already been addressed by this court in the appellant’s first appeal of his transfer order to circuit court. This court has previously addressed issues II, III, and IV of the appellant’s brief, and the holdings of Taylor v. State, supra, are dispositive of these issues. The findings of Taylor v. State leave only one issue raised by the appellant which has not been addressed by this court in the appellant’s previous appeal of his transfer hearing.
I
The appellant contends his arrest was illegal, and, as a result, even if the appellant is assumed to have consented to any search or voluntarily made any statements, the same were the tainted product of an illegal seizure and arrest and are due to be suppressed.
While investigating the missing persons report of Kammye Lytorcha Huey, Officer Robert Jacobs and Officer Joe Harrel talked with the appellant and asked him when he had last seen Kammye Lytorcha Huey. The officers were questioning anyone who might give them a lead in locating Huey at this time. The appellant told the officers that the last time he had seen Huey was after school on Tuesday. (The victim was reported missing on Tuesday, and this interview took place on Wednesday.) (R. 174.)
The officers also talked with Coach Max-ey and Alberta Hall. (R. 206.) These people told the officers that Huey accused the appellant of being the father of her child, and the appellant and Huey got into an argument in the school cafeteria. This incident took place two months before the victim was reported missing.
On January 24, 1985, between 3:00 and 3:30 p.m., the body of the victim was discovered in the basement of Selma High School. (R. 151.) At this time, the officers decided that they needed to talk with the appellant. Officer Smitherman was dispatched, without a warrant, to bring the defendant to police headquarters for questioning. The officer testified that the appellant was not under arrest at this time and that the appellant agreed to go with him to police headquarters. (R. 152, 161, 171.)
*524 Officer Smitherman testified that the appellant was very nervous when they were talking to him. (R. 171.) His parents also asked if they could go and they were told they could, but that they would have to go to the station in his mother’s vehicle, and he was told by Officer Abbott, that “I would rather you ride with us.” (R. 272.) The parents of the appellant followed the officers to police headquarters in their own vehicle. The appellant’s mother testified also that the appellant agreed to go to the station with the officers when they told him that they needed to talk to him about the death of Kammye Huey. (R. 329-330.) She also stated that the officers did not tell the appellant that he was under arrest. On the way to the station, the appellant started conversing with the officers and they were afraid that he would say something about the case.
Officer Smitherman testified that he stopped and recited the appellant’s Miranda rights to him. (R. 164.) Officer Smitherman testified that the reason he read the appellant his Miranda rights was because “he was not the officer in charge of the investigation and he would rather the appellant not say anything, and if he did, he would be protected.” (R. 164.) Officer Smitherman did not advise the appellant that he had the right to confer with his parents at any time during questioning, nor did he advise him that, if his parents could not afford a lawyer, that a lawyer would be appointed for him, but the appellant was advised that, if he could not afford a lawyer, then one would be appointed for him. (R. 273-274.)
Upon arriving at the Selma Police Headquarters, Detectives Smitherman and Abbott took this appellant to the third floor to the detectives division. The appellant was taken to Detective Jacobs’ office, and here he was in the presence of either Officer Abbott or Officer Smitherman at all times. The appellant’s parents arrived shortly thereafter and they were also taken to Detective Jacobs’ office. Detectives Jacobs and Harrell arrived shortly thereafter. Detective Harrell read the appellant his Miranda rights. Detective Harrell asked the appellant if he understood these rights, and, if so, would he initial each right that he understood. (R. 179-180.) The appellant read the Miranda form, initialed each of the rights on the Miranda form, and signed the waiver of rights at approximately 3:50 p.m. on January 24, 1985. (R. 179-180.) The appellant was not advised that he could confer or consult with his parents at any time during the questioning, nor did he advise the appellant that, if his parents or guardian could not afford a lawyer, one would be appointed for him. (R. 181-183.) The officers never told the appellant at any time that he was free to leave or that he was not under arrest. (R. 163, 165, 166, 189, 213, 243, 256, 276, and 286.)
Detective Jacobs asked the appellant for his tennis shoes and the appellant gave them to him. The appellant’s mother testified that he voluntarily gave his shoes to Detective Jacobs. (R. 330.) This occurred between 3:50 and 4:00 p.m., and the shoes were delivered to Officer James C. Rutledge around 4:04 p.m.
Detective Jacobs then went to the crime scene, and upon his return, he asked if he could talk to the appellant alone. At this time, Mr. Roper, the appellant’s stepfather, asked if the appellant needed a lawyer, and Detective Jacobs replied, “I can’t answer that question right now. It’s still in the investigative stage.” (R. 225.) The appellant replied, “I don’t need a lawyer.” (R. 225.)
Detective Jacobs and Detective Abbott then began questioning the appellant about some scratches on his face, and where he was on the afternoon of January 22, 1985. (R. 226-227.) The appellant told the officers he received the scratches in a wrestling match at school with Oscar Vaughn. (R. 203.)
During this time, the appellant was also asked to remove his shirt to see if there were any other injuries on his upper body. (R. 226-227.) In addition, hair and fingernail samples were also taken from the appellant. (R. 227.) The record shows no indication that these samples, or the appellant’s taking off his shirt, was done against the appellant’s will.
*525 After Detectives Jacobs and Smitherman had questioned the appellant alone, they obtained a permission to search form from Ethel Roper, the appellant’s mother, to search the premises of 1204 Franklin Street. This is the address of the Ropers’ residence where the appellant lived. (R. 228.) The purpose of the search was to obtain the clothing that the appellant wore on the day that the victim was reported missing. The appellant was taken to his residence by the officers and was not allowed to ride with his parents. (R. 213, 240, 245.) The officers obtained several items of clothing which the appellant was wearing on the day in question, including a maroon jacket that had a blood stain on it. (R. 231.) The appellant and the officers arrived back at the police station around 5:00 p.m.
When the officers and the appellant arrived back at the police station, the appellant was photographed with the approval of an order from Judge Childers. (R. 240.) The photograph was taken to show to a witness who said she saw the victim talking to a black male after school. The witness did not identify the appellant as the person she had seen the victim talking to. (R. 241, 247-249.)
The officers again wanted to talk to the appellant alone. The parents of the appellant sat in the hallway while the appellant was alone in the room with Detective Harrell. (R. 193, 197.) Lieutenant Lewellen then joined in the questioning at approximately 6:00 p.m. When questioned about the scratches, the appellant again said it happened in a wrestling match. (R. 203.) Officer Lewellen said he would check that out, and then the appellant changed his story and said that he got the scratches from Kammye Huey. Lieutenant Lewel-len’s questioning was interrupted by a telephone call from Keith Parks who told him not to question the appellant any more because he was to be represented by attorney Cartledge Blackwell. (R. 295.) After the telephone call, the appellant wanted to continue with the interview. (R. 295.) Lieutenant Lewellen refused to continue, and then the appellant asked if they could talk off-the-record, and again Lieutenant Lewellen refused. (R. 295.) The appellant was formally arrested at approximately 10:00 p.m. for the murder of Kammye Ly-torcha Huey.
The appellant contends that he was under an illegal arrest and, as a result, any evidence gathered was illegally seized. This court does not agree. There is no indication in the record that the appellant did not consent to being at police headquarters, or that he did he not consent to fingernail scrapings, hair samples, or to giving the officers his tennis shoes. In fact, the appellant’s mother testified that he voluntarily went to the station and voluntarily gave his tennis shoes to the police officers. A voluntary trip to the police station for questioning does not implicate the Fourth Amendment. Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985).
The appellant also contends that he was never told that he was free to leave, but a careful review of the record shows that the issue was never brought up by the appellant. (R. 257.) The only time this issue was raised was at one point when the mother asked if the appellant could leave, and she was told that they had a few more questions to ask the appellant. (R. 329.)
The voluntariness of the interrogation is supported by statements made by the appellant. At one point, Keith Parks called and told the officers to stop their questioning because the appellant was being represented by counsel. The appellant wanted to continue the interrogation even after Lieutenant Lewellen stopped, and also wanted to talk off-the-record after Lieutenant Lewellen stopped the questioning. (R. 295.) The appellant stated at one instance that he did not need a lawyer. (R. 225.)
The appellant also contends that he was not told that he had the right to communicate with his parents and, therefore, the appellant was denied rights under Rule 11(A)(4) A.R.J.P. It would initially appear that any statement should be suppressed, but this issue has already been addressed in Taylor v. State, supra. The appellant’s parents were present at the time the appellant’s Miranda rights were given, thus, *526 subsection (4) does not apply. Because the parents were present and communicating with the appellant, Rule 11(A)(4), A.R.J.P., did not apply to the appellant. Taylor v. State.
The consensual nature of the questioning is also supported by the fact that the officers would consult with the parents of the appellant regarding their wishes to talk to the appellant alone.
Consent must be determined from the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The fact that the appellant was told that he was being questioned about the death of Kam-mye Huey, and the fact that his parents were with him, support the conclusion that his consent was voluntarily given. The fact that his parents first talked to the officers before they examined the appellant also indicates the consensual nature of the questioning at issue. Furthermore, the appellant wanted to continue the interview even after Lieutenant Lewellen ceased the questioning.
For reasons herein cited, this cause is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.
BOWEN, P.J., concurs in result only.