TYSON, Judge.
Robert Horth was indicted for the intentional murder of his wife, Kathy Horth, in violation of § 13A-6-2, Code of Alabama 1975. The jury found him “guilty as charged in the indictment” and he was sentenced to life in prison. He raises six issues in this appeal.
I
The appellant argues that the trial court erred in denying his motion to suppress the fruits of a search of his residence which was conducted after his arrest. The appellant specifically contends that the search was based on his consent and that such consent was tainted because there was no probable cause for his arrest.
“An officer has probable cause to make an arrest when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to believe that the suspect is committing or has committed the offense.” Gord v. State, 475 So.2d 900, 902 (Ala.Crim.App.1985) (emphasis supplied); Cox v. State, 489 So.2d 612 (Ala.Crim.App.1985). The record reveals that the following facts were within the arresting officer’s knowledge when he arrested the appellant. The appellant reported his wife missing on a Wednesday. On Thursday, two deputies went to the appellant’s house to investigate the missing person report. They found a *696 bloody nightshirt that belonged to Kathy Horth. The appellant told the deputies that he and his wife had a fight at approximately 1:00 a.m. on Wednesday and she left the house. He said she was drunk. He also told the deputies that he passed out on the couch after she left. The deputies came back on Friday to continue their investigation. They found Kathy Horth’s body buried approximately four feet from the edge of the back porch. When one of the deputies uncovered a piece of her clothing, the appellant yelled, “Oh my God, that’s my wife. I didn’t shoot her. I didn’t shoot her.” (R. 115). The arresting officer then put the appellant in the appellant’s automobile and read him his Miranda rights. Approximately 30 to 40 minutes later, after securing the area, the arresting officer asked the appellant if he would sign a consent to search. The appellant signed the consent form after the officer read it to him and he initialed that he understood this.
The appellant argues strenuously that there was no probable cause for his arrest because the arresting officer testified that he had no “inkling” that a homicide had occurred until he found the body. (R. 167). This argument has no merit. Prior to finding the body, there were many possibilities for the victim’s disappearance to be considered. Although the arresting officer did not consider his investigation to be a homicide investigation until he found Kathy Horth’s body, when he found the body there were sufficient facts within his knowledge at that time for him to believe that the appellant had committed this offense. See Gord.
We have independently scrutinized the objective facts surrounding the appellant’s arrest and find that there was probable cause for his arrest. See Cox. Therefore, his consent was not tainted by an illegal arrest. Even if we had found that the arrest was illegal, such a finding would not have invalidated the consent search under the particular facts of this case. See Bradley v. State, 494 So.2d 750 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986) (fruits of a consent search may be properly admitted when the consent is voluntary and is sufficiently an act of free will to purge the taint of a Fourth Amendment violation).
II
The appellant next contends that the trial court erred in admitting a consent form signed by him approximately three weeks after his arrest, which allowed law enforcement officers to take hair and blood samples from him, because he was being illegally detained at the time he gave his consent. The basis of this argument was previously addressed by this court in our discussion of the first issue above and, likewise, has no merit.
III
The appellant argues that there was insufficient evidence to sustain his conviction. The record reveals the following: The appellant reported that his wife was missing on September 16, 1987, at approximately 11:00 a.m. A deputy sheriff was dispatched to the appellant’s trailer home at 11:30 a.m. to obtain a general missing person report. The appellant stated at that time that he and his wife had an argument at approximately 1:00 a.m. and she left the house and started walking down the street. He said she was drunk.
Investigator O’Neal Terry and Officer Don Judkins of the Morgan- County Sheriff’s Department went to the appellant’s trailer on September 17 to investigate the missing person report. Terry testified that the appellant told them about the fight he had with his wife early Wednesday morning. The appellant also told them that he had been drinking and that he passed out on the couch after she left. The appellant gave the deputies his permission to look around for clues. Terry testified that Jud-kins found a bloody nightshirt with a bloodstain about the size of a grapefruit around the waist area. He testified that the appellant stated that his wife had recently had an abortion and that was the reason for the bloodstain. The officers left the nightshirt at the trailer. The appellant told Terry that his wife might be on a boat owned by her employer. The officers then *697 left for the harbor to look for Kathy Horth. She was not on the boat.
The next day the officers went back to the trailer park and searched some abandoned houses and trailers. At approximately 10:30 a.m., they went back to the appellant's trailer. The appellant was in the process of painting his back porch black. The appellant again gave the officers his permission to look around. Officer Judkins looked around and asked Terry to look at a spot with some fresh dirt near the porch. Terry asked the appellant if anyone had been digging there recently and the appellant said no. The appellant told Terry that there was a shovel in the front of the trailer. After moving some of the dirt, Terry discovered what appeared to be a shirt, but which turned out to be a pants leg. The body was buried approximately four feet from the porch. Terry testified that, when he uncovered the clothing, the appellant hollered, “Oh my God, that’s my wife” and, “I didn’t shoot her.” (R. 115). Terry immediately read the appellant his rights and the scene was secured.
No further investigation took place until laboratory employees from the Alabama Department of Forensic Sciences arrived. Terry testified that the nightshirt that had a bloodstain on it the day before had been washed. There was blood splattered in the back bedroom. When the officers asked the appellant about the blood, he stated that his wife started a fire while smoking in bed several nights earlier and he had tried to put it out with Kool-Aid and Coke.
Shirley Saare, a neighbor who lived in a trailer which faced the Horth trailer, testified that at approximately 10:30 p.m. on the Tuesday night before the victim’s disappearance, she was awakened by a thumping noise that came from the direction of the Horth trailer. Her husband, James, testified that, when he arrived home from work at 12:30 a.m., he heard a bumping sound coming from the Horth trailer as he walked toward his back door. He also noticed that all of the lights were on in the Horth trailer and he saw the curtains move. His wife woke up again at 1:00 a.m. and they both looked at the appellant’s trailer through their back door window. Ms. Saare testified that all of the lights were on in the Horth trailer and she could see a figure moving back and forth in the bedroom. Mr. Saare testified that he could see a figure in the Horth trailer moving its arms up and down.
Tim Bradford was Kathy Horth’s supervisor at work. He testified that Kathy Horth picked up a report at the office on Tuesday. When she did not come to an important staff meeting on Wednesday morning, he called the appellant. He testified that the appellant told him that Kathy had stayed with a friend the night before and she would be getting a ride to work with her. The appellant also told him about the fight he had with his wife the night before.
Mitzi Robinson, who was the victim’s coworker, testified that she called the appellant on Wednesday afternoon. The appellant also told her about the argument. She testified that the appellant also called her and tried unsuccessfully to have her release his wife’s payroll check to him. Another co-worker, Yickey Moses, testified that she called the appellant on Wednesday afternoon and offered to take care of his baby that night. She testified that, when she brought the baby back to the office the next day, the appellant came running out of the office. She also testified that he brought some pictures of his wife to the office so he could make some missing person posters.
Vickie Cameron, who was a friend of Kathy Horth’s for 11 years, testified that the appellant and his wife had a stormy relationship. The appellant told her about the fight with his wife. Cameron’s boyfriend, Billy Ray Walls, testified that the appellant spoke to him about divorcing his wife, but was afraid that she could get custody of their son. He also testified that the appellant stated that he would kill Kathy before he would let that happen.
Shaunda Moody lived with her parents at the same trailer park as the Horths. She testified that she arrived home at 2:30 a.m. on Wednesday morning and decided to go for a walk. As she approached the appel *698 lant’s trailer at approximately 3:00 a.m., she heard a noise “like gravel or dirt when you hoe or rake it.” (R. 364). She stopped walking when she was even with the back porch of the trailer. She testified that she saw a person bent over as if they were digging. The person stood up and was holding an object with a long handle. She identified the person as the appellant.
The forensic evidence presented at trial included the following: The bloodstains found in the bedroom on the ceiling, on a picture on the wall and on the doorjamb were the result of “an instrument that had been wielded on repeated blows having become bloody itself and being wielded or slung.” (R. Vol. Ill, 97). Hair particles found painted over on the back porch were identical or similar to the victim’s hair. Samples of bloodstains taken from a bedroom wall and headboard matched the victim’s blood type. Bloodstains found in the bedroom on picture frames, a clock and a candlestick holder were also consistent with the victim’s blood type. The appellant’s fingerprints matched the prints found in the blood on the clock. The focal point of all the blood splatters in the bedroom radiated from at, or near, the head of the bed. The victim died as a result of blunt force trauma to the head. She received 20 lacerations to her face from a blunt object.
Private Investigator Charles Edgar testified for the appellant. He stated that he went to the Horth trailer the night before in order to determine if he could identify a person standing in the back of the trailer while he was standing on the street in line with the back porch. He testified that, if he did not know who was standing in the back, he would not be able to identify that person.
There is more than sufficient evidence to sustain the appellant’s conviction. See Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a question for the jury and a verdict rendered thereon will not be reversed on appeal. Suggs v. State, 403 So.2d 309 (Ala.Crim.App.), writ denied, 403 So.2d 313 (Ala.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1428, 71 L.Ed.2d 648 (1982); Gunn v. State, 387 So.2d 280 (Ala.Crim.App.), cert. denied, 387 So.2d 283 (Ala.1980). We will not set aside a conviction on the basis of sufficiency unless, “allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong or unjust.” Johnson v. State, 378 So.2d 1164, 1169 (Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala.1979); Morton v. State, 338 So.2d 423 (Ala.Crim.App.), cert. denied, 338 So.2d 428 (Ala.1976). Such is not the case here.
IV
The appellant contends that the trial court erred in allowing the State to question a witness about the appellant’s attempts to arrange a date with a 17-year-old girl. The appellant points specifically to the following exchange between the prosecutor and the witness:
“Q. During the time that you were babysitting for the defendant in this ease, Robert Horth, did he ever ask you about getting Lori Thorton to go out with him?
“A. He had asked— (R. 310).
The appellant then objected. The State asserted that the evidence was being offered to show motive and the objection was overruled. The following then occurred:
“Q. Ms. Studer, I believe I asked you whether or not the defendant in this case ever asked you if you would get him a date or get Lori Thorton to go out with him.
“A. He never asked me directly.
“Q. What did he say?
“A. He asked me — ” (R. 313).
The appellant then objected. During a discussion outside the presence of the jury, the trial court sustained the objection. The State claimed surprise. The record indicates that the prosecutor asked the question based on a good faith belief that the witness would respond affirmatively. The objection was again sustained and no further questions along this line were asked of the witness. The appellant argues that the *699 questions were so prejudicial that they deprived him of his right to a fair trial. We disagree.
The record indicates that the prosecutor received a negative response to the question and, therefore, the record does not indicate any reversible error. See Reeves v. State, 456 So.2d 1156 (Ala.Crim.App. 1984). Even if the witness had responded affirmatively or the witness’ answer was interpreted to mean that the appellant had indirectly asked the witness about Lori Thorton, the record would not contain any reversible error because the testimony would be relevant to show motive. Testimony which goes to show motive is always admissible. Donahoo v. State, 505 So.2d 1067 (Ala.Crim.App.1986), Kelley v. State, 409 So.2d 909 (Ala.Crim.App.1981). When the evidence is partially or wholly circumstantial on a particular issue, the question of motive becomes a leading inquiry. Kelley. “Even slight evidence to show motive for doing an act in a criminal case is not to be excluded, but should be left to the consideration of the jury.” Kelley at 913.
The appellant has failed to demonstrate any error. Even if the question and the answer should have been excluded, the exchange between the prosecutor and the witness could not have affected the appellant’s substantial rights. See A.R.A.P. 45.
V
The appellant next contends that the trial court erred in not excluding Shaunda Moody’s testimony which identified the appellant as the person at the back of the Horth trailer when she went for a walk on Wednesday morning. The record reveals that the appellant failed to preserve this issue for review because such did not receive an adverse ruling from the trial court. Robinson v. State, 441 So.2d 1045 (Ala.Crim.App.1983). Even if the issue had been properly preserved for review, the record reveals that the witness was able to unequivocally identify this appellant as the person she saw behind the trailer and, therefore, no error is contained in the record.
VI
The appellant next contends that the trial court erred in denying his motion for new trial because at least one juror improperly considered the appellant’s failure to testify. The appellant relied on a newspaper article which stated that, after the verdict was rendered, one juror stated that the appellant’s failure to testify had made an impression on her and she wanted to hear the appellant’s side. The appellant also alleged at the hearing that he believed that, if subpoenaed, at least two jurors would testify that they considered his failure to testify in their deliberations. This information, which was relied upon by the appellant in his motion, was submitted as an offer of proof after the trial court denied his motion. Prior to denying the motion, the trial court ruled that the information offered by the appellant was not admissible. The appellant contends that the jurors failed to follow the court’s instructions and considered his failure to testify in their deliberations. The record reveals that the trial court thoroughly instructed the jury that they could not consider the fact that the appellant did not testify in weighing and deciding his guilt.
A jury’s verdict may not be impeached by the testimony or affidavits of jurors which discuss what transpired during their deliberations. Allen v. State, 494 So.2d 777 (Ala.Crim.App.1985); Vinzant v. State, 462 So.2d 1037 (Ala.Crim.App.1984). “[Pjublic policy forbids disclosure of jury deliberations.” Vinzant at 1040. An attempt to impeach a jury verdict by showing the “mental operation” of a juror is “improper and not subject to judicial recognition.” Allen at 785 (citing Atwell v. State, 354 So.2d 30, 38 (Ala.Crim.App.1977), cert. denied, 354 So.2d 39 (Ala.1978)). An exception to this rule occurs only when the jury considers extraneous facts. Allen. We agree with the reasoning of Sims v. State, 444 So.2d 922 (Fla.1983) cert. denied, 467 U.S. 1246, 104 S.Ct. 3525, 82 L.Ed.2d 832 (1984), in which that court held that a jury’s consideration of a defendant’s failure to testify is not the same as a jury’s consideration of extraneous facts.
*700 Proof of the appellant’s contentions would have required the jurors to discuss the details of their deliberations and their mental operations. Such evidence is inadmissible for the purpose of impeaching their verdict. See Sims. Therefore, we find that the trial court did not abuse its discretion in denying the appellant’s motion for new trial. See Vinzant.
For the reasons stated above, this cause is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.