El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
El Ministerio Público nos solicita que revoquemos el dic-tamen del Tribunal de Apelaciones que confirmó la supre-sión de cierta evidencia en un caso en que el acusado con-fesó ser autor de un asesinato. Ello así, pues el foro apelativo sostuvo que las declaraciones del acusado que condujeron a los agentes del orden público a localizar el arma homicida fueron producto de un arresto ilegal. En ese contexto, el recurso de autos permite expresarnos sobre la doctrina de los motivos fundados y reiterar las instancias en las que un agente del orden público está autorizado a realizar un arresto sin una orden judicial.
La adecuada atención de la controversia que nos ocupa exige que presentemos los antecedentes fácticos y las inci-dencias procesales de mayor relevancia.
I
El 31 de diciembre de 2009 se halló el cuerpo sin vida del Sr. Ramón Vázquez Sánchez (señor Vázquez Sánchez) en su residencia en el barrio Barahona de Morovis. Según el análisis de la escena, el occiso mostraba heridas de de-fensa en las manos y heridas abiertas en el área abdomi *851 nal, en el costado y en otras partes de su cuerpo. Ese mismo día, el Sr. Mairo Pérez Rivera (señor Pérez Rivera o el recurrido) fue arrestado. Posteriormente, el 15 de abril de 2010 fue acusado por el delito de asesinato en primer grado(1) y por la portación y el uso de un arma blanca, en específico, un cuchillo.(2)
Luego de varios incidentes procesales, el 22 de julio de 2010 la defensa presentó una moción de supresión de evidencia. En particular, solicitó la supresión de la confe-sión que realizó el recurrido en cuanto a los hechos que culminaron en la muerte del señor Vázquez Sánchez, pues adujo que esta confesión fue producto de un arresto ilegal. Por iguales fundamentos, peticionó la supresión de los re-sultados de la toma de huellas dactilares y de la evidencia física que se obtuvo, analizada por el Instituto de Ciencias Forenses. Así también, solicitó que se suprimiera el cuchi-llo que se utilizó como arma homicida, el cual fue recupe-rado por la Policía de Puerto Rico con la cooperación del acusado.
Oportunamente, la Fiscalía se opuso a la solicitud de supresión de evidencia y sostuvo que la Policía tenía moti-vos fundados para arrestar al recurrido, conforme a la Re-gla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.(3) En síntesis, el Estado expuso que los motivos fundados consis-tían en que los agentes tenían información en ese momento de que el señor Pérez Rivera era un vecino cercano del occiso y que había tenido problemas únicamente con él, que la noche de los hechos dos vecinos lo observaron en los predios de la casa de la víctima y que fue la única persona vista merodeando la escena del crimen. (4)
Así las cosas, el 4 de agosto de 2010 el foro de primera *852 instancia celebró la vista de supresión de evidencia. En esta, la Fiscalía presentó como prueba testifical al sargento Francisco Pérez Rivera (sargento Pérez) y al agente Juan Grau Otero (agente Grau). Por estipulación de las partes, se sometió como prueba documental lo siguiente: fotogra-fías, condiciones de ingreso, consentimiento para la toma de huellas dactilares y los documentos que evidenciaban que se le realizaron las advertencias de ley. Además, el Estado presentó la declaración jurada suscrita por el señor Pérez Rivera el 4 de enero de 2010.(5)
En conformidad con la transcripción de la prueba oral, las declaraciones de los testigos pueden resumirse como reseñamos a continuación.

Testimonio del agente Juan E. Grau Otero

El agente Grau declaró que el 31 de diciembre de 2009 se dirigió al barrio Barahona de Morovis luego que el retén de turno le informará que había una persona muerta en una residencia. Una vez llegó al lugar, entró a la casa y notó que había sangre en el suelo y vio el cuerpo de la víctima arrodillado frente al sofá. En esa posición, se per-cató de que la mano derecha del cuerpo tenía heridas “como de defensa”. (6) Al observar esto, solicitó entonces a la familia —incluidos el hermano y el cuñado de la víctima:— y a los vecinos que salieran de allí. Continuó relatando que subsiguientemente llamó a su supervisor y le indicó que, según lo apreciado por él, la escena revelaba urna muerte violenta. De esa forma, procedió entonces a entrevistar al hermano de la víctima y le preguntó si el occiso había te-nido problemas con alguien. Indicó el agente que este le expresó que sí, que sentía temor y que sospechaba que el recurrido pudo haberle hecho algo o estaba involucrado en
*853 el asesinato.(7) Ante ello, el agente Grau le preguntó por qué pensaba eso y él le dijo que ellos (el occiso y el recu-rrido) habían tenido un problema, puesto que presunta-mente el recurrido le había robado al señor Vázquez Sán-chez un dinero.
Acto seguido, el funcionario entrevistó al señor Pérez Rivera quien, según la información que se tenía hasta ese momento, fue la persona que encontró al occiso.(8) El agente Grau atestó que el recurrido le relató que mientras subía por el lateral de la casa del occiso, vio unas gotas de sangre en el piso y en la puerta, y que por ello pensó que habían matado a alguien o que había parido una gata. El agente relató que en ese momento percibió que había algo raro en lo que el recurrido decía, pues las manchas de san-gre de la puerta no se podían ver desde el lado que el re-currido dijo que las vio. El agente continuó declarando que cuando le inquirió al señor Pérez Rivera a esos efectos, este no le supo contestar, por lo que le solicitó que se quedara en el lugar para que los agentes de homicidios lo entrevistaran.
Dijo el testigo que luego pasó a entrevistar al cuñado del occiso. Este último le manifestó que fue el señor Pérez Rivera quien llegó a su casa para decirle que habían matado al señor Vázquez Sánchez.(9) El agente Grau testificó, ade-más, que una vez llegaron los familiares del occiso, estos hicieron comentarios que le llevaron a preocuparse por la seguridad del recurrido y del hermano del occiso. Por tal razón, a eso de las 9:00 a.m. decidió enviarlos a un cuartel de la policía en el barrio Barahona para su protección. Re-lató el agente que el recurrido fue ubicado en un cuarto de entrevistas y que el hermano del occiso permaneció con el retén. Una vez llegó el agente de homicidios, procedió a *854 informarle los datos que tenía del incidente, terminando así su intervención en el caso.

Testimonio del sargento Francisco Pérez Rivera

Por su parte, el sargento Pérez declaró que cuando en-contraron el cuerpo del señor Vázquez Sánchez se personó a la escena del crimen entre 9:30 a 10:00 a.m. y procedió a entrevistar al agente Grau para obtener datos relevantes del caso. Este último le indicó que había una persona apu-ñalada y muerta en la sala de su residencia (la del occiso). Asimismo, el sargento testimonió que el agente le informó que el recurrido estaba detenido en el cuartel de Morovis y que el hermano del occiso le había indicado que esta persona había tenido problemas con la víctima y que acostum-braba a ir a su casa a robarle.(10) Igualmente, declaró el sargento que el agente Grau le manifestó que el hermano de la víctima también estaba en ese cuartel. Añadió que entonces procedió a entrevistar al cuñado y al hermano del occiso, quienes le dijeron que el señor Pérez Rivera había tenido problemas con él y que siempre se pasaba en el lugar.(11)
El testigo continuó relatando que luego se trasladó a la División de Homicidios en la Comandancia de Arecibo en-tre las 5:00 y 6:00 p.m., y que entrevistó al recurrido des-pués de hacerle las advertencias legales, cosa que hizo en presencia del sargento Robert Mercado.
A continuación resumimos el testimonio del sargento Pérez respecto a la descripción que le ofreció el recurrido en cuanto a lo que vio el día de los hechos.
El recurrido narró al sargento que el 30 de diciembre de 2009 iba camino al trabajo a las 7:00 a.m. acompañado por su esposa y su hermana. El recurrido le dijo que mientras subían, miraron hacia la residencia del señor Vázquez Sánchez y se percató de que había unas manchas de sangre *855 en una toalla. Agregó que en ese momento se cruzó en el camino con el hermano del occiso y le comentó sobre lo que vio. El hermano le dijo que iría entonces a la residencia de su cuñado a buscar las llaves de la casa de la víctima para constatar qué había ocurrido. Según el sargento Pérez, el acusado relató que siguió su camino al trabajo, quedándose algunos 25 minutos allí. Añadió que luego regresó y vio las patrullas que circundaban el área, cuando entonces el agente Grau lo detuvo para hacerle unas preguntas. Con-tinuó relatando el recurrido que un tercero de nombre “Chapo” mató a la víctima y que este último lo amenazó con matarlo si lo delataba. Agregó el sargento que el acu-sado le indicó, además, que el arma que se utilizó en el asesinato estaba detrás de una casa cerca de unas matas de plátano y que estaba dispuesto a llevarlo al lugar para buscarla.
Testificó el sargento que esa misma noche la policía en-trevistó al “Chapo” y a la esposa de este. Sin embargo, en-tendieron que hasta ese momento el “Chapo” no guardaba relación con los hechos.(12) También declaró el sargento que durante esa noche se personaron al lugar donde se encon-traba el cuchillo, pero que por las inclemencias del tiempo decidieron volver al día siguiente (1 de enero de 2010) con el recurrido. Expresó, además, que debido a que el acusado figuraba como sospechoso y por instrucciones de la Fisca-lía, lo mantuvieron en la celda. Señaló que al otro día vol-vieron a buscar el cuchillo con el recurrido y que lo encontraron. (13) Posteriormente, regresaron a la Coman-dancia de Arecibo y, horas más tarde, los agentes liberaron al señor Pérez Rivera.(14)
Continuó relatando el testigo que regresó a la comuni-dad el 4 de enero de 2010 para entrevistar al Sr. Rubén *856 González, quien le informó que el 30 de diciembre de 2009, a eso de las 10:00 p.m., vio al recurrido brincar la verja de la residencia del occiso hacia la carretera. Señaló, además, el sargento Pérez Rivera que ese mismo día solicitó al re-currido que lo acompañara para tomarle huellas dactilares en el cuartel de Morovis y que este accedió a ir de forma voluntaria. Indicó el sargento que ese día llegaron a la es-tación alrededor de las 3:46 p.m. y que nuevamente le leyó las advertencias al recurrido para proceder a tomarle las huellas dactilares, y que este accedió y fue bien cooperador.(15) Manifestó, también, que en ese momento es-tuvieron presentes la agente Rita Rosado —quien figuró como testigo durante la realización de las advertencias— y el sargento Roberto Mercado, quien realizó la toma de las huellas dactilares. Luego de finalizar ese procedimiento —según surge del testimonio del sargento Pérez— ocurrió el incidente siguiente:
Posteriormente a que se tomaron las huellas él me indica que él quiere hablar con nosotros, que él quiere hablar conmigo y que quiere levantar sus manos por que él tiene algo que no puede seguir con eso. Ahí en esos momentos pasa el agente Montalvo y este servidor donde él pero a todo esto él no quiere que yo esté ahí que soy el investigador, yo salgo fuera y habla con el agente Montalvo posteriormente que termina hablar con el agente Montalvo, él me indica el agente Montalvo me indica que pase donde él po[rq]ue él quiere hablar conmigo. Ahí él me indicó me dijo mire yo a usted le fallé yo me quiero sacar esto que tengo por dentro por que [sic] esa muerte como tal, yo estaba ahí, yo fui el que utilic[é] el cuchillo para esa fecha .... (Énfasis nuestro). Transcripción estipulada de la vista de supresión de evidencia, Apéndice de la Petición de certiorari, pág. 172.
El sargento Pérez aseveró que cuando el recurrido co-menzó a hacer las anteriores admisiones, se le hicieron nuevamente las advertencias. Asimismo, expresó que, una vez recibida la información, acudieron a la Comandancia *857 donde se le tomó una declaración jurada al señor Pérez Rivera.
Resumido el testimonio que el sargento Pérez ofreció durante la vista, pasemos entonces a esbozar los detalles de la declaración jurada que suscribió el recurrido el 4 de enero de 2010.
En la referida declaración, el señor Pérez Rivera narró los hechos que le provocaron la muerte al señor Vázquez Sánchez.(16) Declaró que mientras ayudaba a la víctima a limpiar la casa, este último le ofreció $20 para que tuviera relaciones sexuales con él y que, acto seguido, lo pegó a la cama y abusó de él durante media hora. Cuando terminó, según narra el recurrido en la declaración, la víctima no le pagó los $20. Seguidamente, atestó:
Esa noche yo apagué los “breakers”, a las 10 de la noche de la casa de Moncho que están en la parte de atrás de la casa. Después yo toqué a la puerta de la casa de Moncho. Moncho abrió la puerta un chispito. y Chapo la forzó y la abrió. Yo le di una puñalada de punta con un cuchillo, en la mano. Chapo siguió apuñalándolo por todos lados, en la barriga y por todos lados lo apuñaleó. Yo di la primera puñalá. Chapo le pedía chavos y yo también, pero Moncho decía que no tenía nada. Chapo lo apuñaló muchas veces, Moncho trató de defenderse poniendo las manos al frente y luego cayó al piso del cuarto y gritaba. Apéndice de la Petición de certiorari, pág. 68.
En dicho documento el recurrido alegó, además, ser pa-ciente de APS(17) y que no se tomaba los medicamentos, pero que estaba tranquilo. Con relación al cuchillo, dijo que lo tiró para la maleza detrás de la casa de la víctima y que cayó cerca de una mata de plátano. Igualmente, en rela-ción con lo acaecido el 31 de diciembre de 2009, antes de llegar a su trabajo, le dijo al hermano de la víctima que vio una toalla con manchas de sangre en su residencia. Narró que no pudo trabajar ese día por falta de materiales y que *858 llevó a su padre a su casa. También expresó que, mientras iba de camino a su hogar, el agente Grau lo llamó y le requirió su información personal, y que luego se trasladó al cuartel de Morovis para ser entrevistado en relación con la muerte del señor Vázquez Sánchez. Dijo, además, que luego lo esposaron, le hicieron las advertencias, lo ingresa-ron a una celda y lo llevaron a Arecibo.
El acusado narró en la declaración jurada la versión que le ofreció el 31 de diciembre de 2009 al sargento Pérez, en la que expresó que el “Chapo” era el asesino; dijo conocer dónde estaba el arma del delito y manifestó su disponibili-dad de llevar a las autoridades a encontrarla. Sin embargo, en esa declaración jurada del 4 de enero reiteró que la in-formación provista en ella era verdad y que se le leyeron las advertencias. Consiguientemente, el 5 de enero de 2010 la Fiscalía procedió a autorizar la presentación de las de-nuncias por los delitos imputados.(18)
Luego de evaluada la prueba testifical y documental, el foro primario declaró “con lugar” la solicitud de supresión de evidencia mediante Minuta de 4 de agosto de 2010. Con-secuentemente, se suprimieron varias manifestaciones del recurrido, los resultados de las huellas dactilares y otra prueba física, incluida el arma homicida. (19) En consecuen-cia, dicha evidencia no podría ser presentada como prueba de cargo durante el juicio en su fondo. Insatisfecho, el 6 de agosto de 2010 el Ministerio Público presentó una moción de reconsideración, la cual fue denegada mediante Resolu-ción de 24 de agosto de 2010.
Inconforme con tal proceder, el Estado recurrió al foro *859 apelativo intermedio. Así pues, el 22 de diciembre de 2010 el tribunal a quo modificó la decisión recurrida dictami-nando que procedía admitir como evidencia las manifesta-ciones que el señor Pérez Rivera le ofreció al agente Grau el 31 de diciembre de 2009. Por otra parte, confirmó al foro primario en cuanto a que el arresto del recurrido fue ilegal, debido a la ausencia de motivos fundados para realizarlo. Ante la determinación de la ilegalidad del arresto, coligió entonces que procedía suprimir las manifestaciones que el recurrido le ofreció al sargento Pérez ese mismo día, así como el cuchillo que se ocupó. Empero, el Tribunal de Ape-laciones determinó que no procedía la supresión de las huellas dactilares del acusado obtenidas el 4 de enero de 2010 ni la confesión que este prestó en esa misma fecha.
Así las cosas, el 22 de febrero de 2011 el Ministerio Pú-blico presentó ante nos una Moción en Auxilio de Jurisdic-ción y un auto de certiorari. En su recurso nos solicita que revoquemos el dictamen del Tribunal de Apelaciones y nos señala la comisión del error siguiente:
... Cometió error de derecho el Honorable Tribunal de Apela-ciones al determinar que la intervención de los agente [s] con el acusado el día 31 de diciembre de 2009 fue un arresto ilegal al ser efectuado sin orden, toda vez que existían motivos funda-dos para creer que el acusado había cometido el delito grave de asesinato en presencia de las siguientes circunstancias tácti-cas: a) el cadáver mostraba heridas cortantes en las manos, por lo que en ese momento se investigaba un asesinato (delito grave); b) existía un testimonio que ubica al acusado como la primera persona en llegar a la escena del crimen; c) el agente investigador, Agte. Juan Grau Otero, tenía propio y personal conocimiento de que el acusado estaba mintiendo sobre algo relacionado a la escena del crimen y había observado una con-ducta claramente dudosa por el acusado al ser confrontado con la evidente falsedad de su versión; d) al tomar los datos del hermano del occiso, éste informó que la única persona con quien la víctima tenía problemas era con el acusado, pues ya en una ocasión había sido víctima de su conducta delictiva; y e) también se había informado al agente que el occiso tenía miedo por esos incidentes previos. Petición de certiorari, págs. 22-23.
*860 El 16 de marzo de 2011 expedimos el recurso de epígrafe y ordenamos la paralización de los procedimientos ante el foro primario. Contando con los alegatos de ambas partes, procedemos a resolver.
II
A. El arresto y sus exigencias constitucionales
La Constitución de Puerto Rico establece que ninguna persona podrá ser privada de su libertad o propiedad sin un debido proceso de ley. Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296. Esta disposición es la “matriz de la garantía de los derechos individuales ante la intervención injustificada del Estado con el ciudadano”. Pueblo v. Román Mártir, 169 D.P.R. 809, 821—822 (2007). Es decir, el derecho constitucional a un debido proceso de ley es la “garantía fundamental de protección que tiene un ciudadano contra los posibles abusos o usos arbitrarios de poder que haga el Estado, y constituye la máxima garantía de la aspirada justicia plena e imparcial”. Id. Esta protección se extiende incluso a los procedimientos de investigación criminal sobre el sospechoso de la comisión de un delito. O.E. Resumil, Práctica jurídica de Puerto Rico: derecho procesal penal, New Hampshire, Equity Pub. Co., 1990, T. I, pág. 26.
Como colorario del derecho a un debido proceso de ley, la Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, exige que una vez se realice un arresto, la persona arrestada debe llevarse ante un magistrado sin dilación innecesaria. (20) En los casos en que se realiza un arresto *861 sin una orden judicial, el propósito de este requerimiento es permitir al magistrado que evalúe la existencia de causa probable para arresto. Pueblo v. Aponte, 167 D.P.R. 578 (2006).
En cuanto al requisito de que este trámite se realice sin demora, en Pueblo v. Aponte, supra, establecimos que una vez la persona es arrestada, las autoridades deben llevarlo ante un magistrado en un periodo no mayor de 36 horas. En consecuencia, un arrestado debe comparecer ante un tribunal luego de que se completen los trámites administrativos incidentales al arresto. Por tal razón, en ausencia de razones extraordinarias, cualquier demora en exceso de ese término se presumirá irrazonable. En ese caso aclaramos, además, que esa norma tendría el efecto de establecer el periodo máximo que puede pasar una persona arrestada sin comparecer ante un juez. No obstante, señalamos que si existen circunstancias especiales, un periodo menor de 36 horas puede resultar irrazonable. Id., pág. 585.
Pasemos entonces a reseñar varios aspectos medulares relacionados con la determinación de causa probable pre-vio al arresto.
La exigencia de causa probable para arresto se deriva de la Enmienda Cuarta de la Constitución de Estados Unidos. Esta disposición reconoce el derecho de la ciudadanía a la protección contra registros a sus personas, casas, papeles y pertenencias. Igual protección provee la Sec. 10 de nuestra Carta de Derechos, la cual estima improcedentes los registros, las incautaciones y los allanamientos irrazonables, salvo que exista una autorización judicial basada en “causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a regis- *862 trarse, y las personas a detenerse o las cosas a ocuparse”. Const. E.L.A., supra, pág. 326. La “[e]videncia obtenida en violación a esta sección será inadmisible en los tribunales”. Id. Por consiguiente, se presume irrazonable e inválida toda incautación realizada sin una orden judicial previa. Pueblo v. Serrano Reyes, 176 D.P.R. 437 (2009).
Es importante denotar que la acción penal inicia con la determinación de causa probable para arresto. Es decir, luego de la determinación de que existe causa probable para arrestar o citar una persona, esta última queda sujeta a “responder a los tribunales por la comisión de un delito”. D. Nevares-Muñiz, Sumario de derecho procesal penal puertorriqueño, 9na ed., San Juan, Inst, para el Desarrollo del Derecho, 2011, pág. 45.
De esta forma, siguiendo los parámetros constitucionales mencionados, de ordinario la determinación de causa probable debe ser hecha por un magistrado. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. III, pág. 21. A esos efectos, la Regla 6 de Procedimiento Criminal estatuye que “[l]a determinación de causa probable podrá estar fundada total o parcialmente en una declaración por información o creencia con suficiente garantía circunstancial de confiabilidad”. (Enfasis nuestro). 34 L.P.R.A. Ap. II. En la vista de causa probable para arresto, el juzgador de los hechos debe inferir la probabilidad de que, primero, se cometió un delito y, segundo, que ese delito lo cometió esa persona. Chiesa Aponte, op. cit., pág. 29. Así pues, debemos enfatizar que el propio concepto de “causa probable” revela que no se requiere una certeza precisa y exacta sobre la ocurrencia del delito y la creencia de que el imputado lo perpetró. Véase Herring v. United States, 555 U.S. 135 (2008). Esta determinación debe hacerse a la luz de la totalidad de las circunstancias.
Según mencionáramos, nuestra Constitución pro- *863 híbe que se pueda arrestar a una persona sin una orden judicial fundada en la determinación de causa probable. Pueblo v. Colón Bernier, 148 D.P.R. 135 (1999). El propósito de este decreto es proteger la dignidad de las personas interponiendo la figura imparcial de un juez entre los agentes y la ciudadanía, y dar así una “mayor garantía de razonabilidad a la intrusión estatal”. Id., pág. 141. Véase Pueblo v. Díaz, Bonano, 176 D.P.R. 601 (2009). Sin embargo, este requerimiento constitucional no es absoluto, pues cede ante la necesidad de procesar a aquellos que delinquen.
En atención a ello, nuestro esquema procesal criminal reconoce el imperativo de proveer a los agentes del orden público las herramientas adecuadas para combatir la con-ducta criminal que desconcierta la paz de nuestro pueblo. Ello, claro está, sin que tal proceder conlleve la erosión de las garantías constitucionales antes esbozadas. En particular, la Regla 11 de Procedimiento Criminal enumera, como excepción al mandato constitucional, las circunstancias en las que un funcionario del orden público puede realizar un arresto sin la necesidad de que medie una orden judicial previa. 34 L.P.R.A. Ap. II.
En lo pertinente, el referido precepto, en su inciso (c), establece que un agente del orden público podrá hacer un arresto sin la orden correspondiente “[c]uando tuviere mo-tivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave {felony), indepen-dientemente de que dicho delito se hubiere cometido o no en realidad”. (Énfasis nuestro). 34 L.P.R.A. Ap. II, R. 11(c).
La naturaleza y el alcance de la figura de “motivos fun-dados”, según exigidos por esta regla, han sido objeto de discusión continua y de análisis riguroso. Explica el profe-sor Chiesa que el “motivo fundado” de la Regla 11, supra, equivale a la “causa probable” requerida constitucional-mente según la Enmienda Cuarta de la Constitución federal y el Art. II, Sec. 10 de la Constitución de Puerto Rico, *864 supra. Chiesa Aponte, op. cit, 1991, Vol. I, pág. 387. Comenta, pues, que esa identificación de conceptos es inevitable, ya que de otra forma se estaría violando la norma constitucional contra arrestos irrazonables. Id. Véase, también, Pueblo v. Calderón Díaz, 156 D.P.R. 549 (2002).
Dentro de ese marco conceptual constitucional, hemos reiterado que los motivos fundados y la causa probable para arresto son sinónimos. Pueblo v. Calderón Díaz, supra. Por consiguiente, los motivos fundados deben ba-sarse en el mínimo de información que convenza a un juez de que existe causa probable para arresto. Id.
De esa forma, hemos pautado que los motivos fundados constituyen “aquella información y conocimiento que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito, independientemente de que luego se establezca o no la comisión del delito”. (Enfasis suprimido). Pueblo v. Martínez Torres, 120 D.P.R. 496. 504 (1988).
Cónsono con ello, en Pueblo v. Calderón Díaz, supra, expresamos que al hacer la determinación de si el arresto sin una orden cumple con el requisito de causa probable, el juez debe evaluar la información con la que contaba el agente que realizó el arresto, así como el cuadro fáctico que este tenía ante sí. íd., pág. 559. En esta etapa es necesario determinar si el agente del orden público que realizó el arresto conocía o estaba informado de hechos concretos que razonablemente apuntaran a la comisión de un delito. Id. Es por ello que hemos intimado que meras sospechas no bastan. Id.; Pueblo v. Colón Bernier, supra.
Nuestros pronunciamientos jurisprudenciales nos llevan a colegir que la existencia del motivo fundado se determina a base de criterios de probabilidad y razonabilidad. Pueblo v. Ruiz Bosh, 127 D.P.R. 762 (1991). Aunque las meras sospechas no bastan, al evaluar la existencia de motivos fundados al momento del arresto no es necesario que el juez quede convencido, fuera de toda duda *865 razonable, que se violó la ley y que la persona implicada fue la responsable de tal infracción. Pueblo v. Calderón Díaz, supra; Pueblo v. Muñoz, Colón y Ocasio, 131 D.P.R. 965 (1992).
Así, por ejemplo, en Pueblo v. Ruiz Bosh, supra, pág. 762, la Policía recibió confidencias que indicaban que en horas de la noche un avión arrojaba paquetes con sustancias controladas, los cuales eran recogidos por personas que esperaban en un vehículo de motor en un cañaveral. Luego de recibir esa información, se le requirió a un agente que se personara a un accidente donde el vehículo de motor implicado contenía drogas en su interior. Encontrándose en dicho lugar, el agente fue informado que en el mismo barrio aterrizó algún tiempo antes una avioneta, en la cual se ocupó marihuana. Dos individuos extraños a la comunidad local fueron arrestados ese día en el área cercana al incidente. Así pues, al dirimir sobre la existencia de motivos fondados para el arresto expresamos:
En el ejercicio razonable del derecho, y la obligación, que tiene todo agente del orden público en nuestra jurisdicción de investigar toda querella sobre posible actividad delictiva, Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 144 (1985), el agente Hernández les hizo una serie de preguntas a dichos individuos. Al inquirir sobre el lugar de donde provenían, és-tos no pudieron contestar satisfactoriamente preguntas que se le hicieran a esos efectos, las contestaciones a las cuales resul-taban de fácil y obligatorio conocimiento para personas resi-dentes de la ciudad de la cual ellos originalmente alegaron provenir. Tenemos, finalmente en cuanto a este punto en particular, que la afirmación de dichos sujetos a los efectos de que se encontraban en dicho lugar “bebiendo” era una que resultaba palpablemente falsa a la mera observación.
... En otras palabras, somos del criterio que nada impide que la determinación que sobre “motivos fundados” requiere el in-ciso (c) de la citada Regla 11 de Procedimiento Criminal, ante —para que un funcionario pueda realizar un arresto sin orden judicial— sea el resultado de la “suma acumulativa” de unos hechos que, aun cuando no ocurren simultáneamente, se desa-rrollan o fluyen en rápida sucesión dentro de un término de *866 tiempo relativamente corto', en el presente caso, en un período aproximado de tres (3) horas. Resolvemos que, bajo las cir-cunstancias específicas del caso ante nuestra consideración, el agente Hernández no venía en la obligación de acudir ante un magistrado en busca de una orden judicial para efectuar el arresto del apelante Ruiz Bosch y el coacusado Rosario Ayala en la noche del 30 de marzo de 1982. (Énfasis en el original suprimido y énfasis nuestro). Pueblo v. Ruiz Bosch, supra, págs. 771-772.
En sintonía con lo anterior, es imperativo puntualizar que “[e]l concepto de motivos fundados incluye tanto evidencia directa como circunstancial”. Nevares-Muñiz, op. cit., pág. 61. Sin embargo, esta determinación no tiene que ser objeto de un análisis definido por un estándar de prueba rígido. Lo que debe existir es un conjunto de circunstancias que le permitan a una persona ordinaria y prudente inferir que se cometió un delito y que determinada persona es la responsable de tal comisión. Pueblo v. Calderón Díaz, supra; Pueblo v. Alcalá Fernández, 109 D.P.R. 326 (1980); Véase, también, Illinois v. Gates, 462 U.S. 213, 231 (1983).
Por otra parte, debemos señalar que la determinación de si hubo un arresto no está condicionada a la admisión que haga un agente sobre ello. El Tribunal Supremo federal resolvió en Stansbury v. California, 511 U.S. 318 (1994), que al analizar si una persona está bajo custodia es preciso utilizar un criterio objetivo. En palabras del Tribunal, “la interrogante relevante es cómo un hombre razonable, en la posición del interrogado, hubiera atendido la situación”. (Traducción nuestra). íd., pág. 324. E.L. Chiesa Aponte, Derecho procesal penal: etapa investigativa, Publicaciones J.T.S., 2006, pág. 35. Más adelante, el Tribunal Supremo federal señala:
El conocimiento o creencias del oficial podrían tener que ver con la cuestión de custodia si son comunicados a la persona interrogada, bien por palabras o por conducta. ... Estas creen-cias son relevantes solo en la medida en que afectarían cómo una persona razonable en la posición de la persona interro- *867 gada evaluaría el alcance de su libertad de acción. (Traducción nuestra). Stansbury v. California, supra, pág. 325. Véase, también, Chiesa, Derecho procesal penal: etapa investigativa, op. cit, pág. 36.
A tenor con lo anterior, hemos expresado que
. . . una persona ha sido incautada sólo cuando a la luz de la totalidad de las circunstancias, el modelo de una persona ra-zonable hubiera pensado que no estaba en libertad de mar-charse del lugar. Lo determinante es que la libertad del individuo haya sido efectivamente restringida. (Énfasis en el original). Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144 D.P.R. 1, 59-60 (1997). Véase Pueblo v. Pacheco Báez, 130 D.P.R. 664, 669 (1992).
El hecho de que el agente se niegue a admitir que realizó el arresto no implica que la información que ha recopilado hasta ese momento es insuficiente a los efectos de constituir motivos fundados para arrestar. Es decir, si a la luz de la totalidad de las circunstancias la evidencia obtenida hasta el momento del arresto permite que: (1) un hombre ordinario y prudente crea que es probable que se cometió un delito y (2) determinada persona fue su autor, no hay por qué concluir que el arresto fue ilegal. En otras palabras, la existencia de causa probable tampoco está condicionada a la determinación subjetiva del agente que realiza un arresto.
LaFave así lo reconoce cuando expresa que el examen a realizarse para la determinación de causa probable es objetivo. W.R. LaFave, Search and Seizure: a Treatise on the Fourth Amendment, 4ta ed., Minnesota, Ed. Thomson West, 2004, Vol. 2, pág. 35. A esos efectos y a tono con lo antes esbozado, el Tribunal Supremo de Estados Unidos enfatiza que la existencia de causa probable debe eva-luarse a la luz del criterio de un hombre prudente y razonable.(21)
*868 Cabe señalar que puede surgir la situación de que un agente realice un arresto sin la creencia subjetiva de que tiene motivos fundados para hacerlo. LaFave, op. cit., pág. 37. Este factor, a su vez, puede relucir en una vista de supresión. Ante esta disyuntiva, LaFave señala que el he-cho de que un agente no reconozca —o incluso niegue— la existencia de motivos fundados para realizar un arresto, no implica que el juzgador de los hechos no pueda determi-nar causa probable. Id. Para aclarar este extremo, el tra-tadista cita las siguientes expresiones del Tribunal de Dis-trito de Pennsylvania:
[T]he mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause. * * * Moreover, since the courts have never hesitated to overrule an officer’s determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer’s judgment that none exists. (Enfasis nuestro). LaFave, op. cit., pág. 37. Véase United States ex rel. Senk v. Brierley, 381 F.Supp. 447 (1974), afirmado por el Tercer Circuito en 511 F.2d 1396 (3er Cir.), cert. denegado, 423 U.S. 843 (1975).
Específicamente, el agente de policía testificó allí que no tenía causa probable para hacer un registro. En vista de ello, dicho foro citó las expresiones siguientes:
“Of course, we would not consider ourselves bound by a police officer’s inability to articulate his conclusions if the facts clearly demonstrated the existence of probable cause . . .”. United States ex rel. Senk v. Brierley, supra, pág. 463, citando a United States v. Day, 455 F.2d 454, 456 (3er Cir. 1972).
Por tal razón, al considerar si un arresto es válido, la intención subjetiva de un agente es un factor *869 secundario. El único requisito es que al momento de la rea-lización del arresto exista causa probable. Véase Washington v. State, 922 So.2d 145 (Ala. Crim. App. 2005), citando a Carruth v. Barker, 454 So.2d 539, 540 (Ala. 1984). En consecuencia, el hecho de que un agente no crea que existe causa probable no anula la posibilidad de que el Estado justifique un arresto si evidencia lo contrario. Florida v. Royer, 460 U.S. 491 (1983). En torno a ese extremo, en Florida v. Royer, supra, caso en que un oficial testificó en una moción de supresión de evidencia que no existía causa probable para un arresto, el Tribunal Supremo federal con-cluyó que ello no impedía que el Estado pudiera probar que sí existía causa para arrestar. Véase LaFave, op. cit. pág. 38.
Acorde con ello, es ineludible concluir que la causa probable se mide a la luz de un estándar objetivo. Beck v. Ohio, 379 U.S. 89 (1964). Una vez se cumple con este es-tándar, resulta innecesario que el agente que hizo el arresto admita la creencia subjetiva de que tenía los moti-vos fundados para arrestar. Véase Cox v. State, 489 So.2d 612, 621 (Ala. Cr. App. 1985),(22) United States v. Salinas-Calderón, 728 F.2d 1298, 1300-1301 (10mo Cir. 1984). De lo anterior se colige, por consiguiente, que un tribunal no está atado a las conclusiones o expresiones de un policía en lo relativo a los motivos fundados del arresto que realizó. Ello así, pues la misión del foro juzgador es evaluar la va- *870 lidez del arresto independientemente del criterio subjetivo del agente que lo realiza.
Lo determinante es la razonabilidad del arresto cuando se efectuó, considerando la figura del hombre ordinario y prudente. Este requisito de razonabilidad del arresto que exigen la Cuarta Enmienda y nuestra Constitución depende de una indagación predominantemente objetiva. Ashcroft v. al-Kidd, 131 S.Ct. 2074 (2011). Consecuente-mente, luego de la evaluación objetiva de la totalidad de las circunstancias, a la luz del criterio del hombre razona-ble y prudente, debemos preguntarnos si existió la causa probable que justificó la acción del arresto. Id. Véase Scott v. United States, 436 U.S. 128, 138 (1978). Por medio de este enfoque se reconoce que la Cuarta Enmienda, en lugar de escrudiñar los pensamientos de un agente, regula más bien su conducta. Ashcroft v. al-Kidd, supra. De esta forma, se promueve una aplicación imparcial de la ley. Id.
En conjunto con todo lo antes expuesto, al momento de hacer la determinación de causa probable, debemos evitar análisis artificiosos o especializados. Citando a Brinegar v. United States, 33 U.S. 160, 175 (1949), en Pueblo v. Muñoz, Colón y Ocasio, supra, pág. 980, señalamos lo siguiente:
“Cuando nos referimos a causa probable ... actuamos a base de probabilidades. Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida coti-diana a base de las cuales actúan hombres prudentes y razo-nables y no técnicos en derecho. La norma o regla en cuanto a la prueba, por consiguiente, depende de la cuestión que debe probarse”. (Énfasis nuestro y en el original).
Así también, en cuanto a la interacción de este requisito con la práctica de los agentes de la policía de compartir información investigativa en un caso, hemos precisado que “[e] sta exigencia no impide que [los agentes] actúen en forma coordinada y concertada en la investigación de un crimen, de manera que sus conocimientos individuales *871 sean un conocimiento colectivo y suficiente.” Pueblo v. Serrano Reyes, 176 D.P.R. 437, 444 (2009). Véase, también, Pueblo v. Martínez Torres, supra. Ello es así, debido a que de otra forma sería imposible llevar a cabo el trabajo en equipo requerido para poder combatir efectivamente la ac-tividad criminal. Por ello, los motivos fundados de un agente pueden ser válidamente atribuidos al funcionario del orden público a quien este primero se los transmitió. Ahora bien, es preciso que al evaluar una solicitud de su-presión de evidencia, el Ministerio Público presente prueba para “establecer los motivos fundados que tuvo el agente que dio la orden o que originó la cadena de información que resultó en el arresto”. Pueblo v. Serrano Reyes, supra, pág. 444.
Igualmente, el Ministerio Fiscal está obligado a probar la existencia de las circunstancias que hicieron innecesaria la obtención de una orden judicial. Pueblo v. Cruz Torres, 137 D.P.R. 42, 47 (1994). Consecuentemente, reafirmamos que el Estado tiene el peso de la prueba de establecer la validez y la razonabilidad de su intromisión con la libertad de los individuos. Pueblo v. Calderón Díaz, supra.
B. Derecho contra la autoincriminación
De otra parte, tanto nuestra Constitución como la de Estados Unidos garantizan el derecho de todo ciudadano a no incriminarse. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 343; Emda. V, Const. EE. UU., L.P.R.A., Tomo 1. Específicamente, nuestra Carta Magna dispone que “[n]adie será obligado a incriminarse mediante su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra”. Const. E.L.A., supra, pág. 343. De esta forma, el derecho contra la autoincriminación se cataloga como uno de los más trascendentales y fundamentales del derecho penal. Pueblo v. Viruet Camacho, 173 D.P.R. 563 (2008).
Igualmente, es norma muy conocida que cuando *872 una investigación realizada por los agentes del orden pú-blico se centra sobre un ciudadano que está bajo su custo-dia, el Estado está obligado a advertirle sobre los derechos que le asisten constitucionalmente contra la autoincrimi-nación y sobre su derecho a ser asistido por un abogado. Pueblo v. Millán Pacheco, 182 D.P.R. 595 (2011); Miranda v. Arizona, 384 U.S. 436 (1966). Concretamente, es necesa-rio que se le comunique al sospechoso que tiene derecho a guardar silencio, que cualquier declaración que haga podrá y será usada en su contra y que tiene derecho a ser asistido por un abogado contratado por él o por el Estado, si la persona no cuenta con recursos económicos. Id.
Sin embargo, hemos reiterado que este privilegio de rango constitucional es renunciable. Pueblo v. Fernández Rodríguez, 183 D.P.R. 770 (2011). Es necesario que tal renuncia se realice de forma voluntaria, consciente e inteligente. íd. Así pues, hemos expresado que para que una renuncia sea voluntaria se debe haber realizado “ ‘sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión’ ”. Id., pág. 789, citando a Pueblo v. Ruiz Bosch, supra, pág. 775. En consecuencia, “para que se entienda renunciado un privilegio su dueño o poseedor debe ser advertido o informado por las autoridades pertinentes de su derecho al privilegio y de la existencia del mismo”. Pueblo v. Fernández Rodríguez, supra, pág. 789. Véase Pueblo v. Millán Pacheco, supra.
En torno a ese particular, para que un tribunal determine la validez de la renuncia a la luz de la totalidad de las circunstancias, el Ministerio Público debe presentar prueba tendente a demostrar cuáles fueron las adverten-cias que se realizaron y las circunstancias en las que el sospechoso hizo la confesión o la admisión. Pueblo v. Viruet Camacho, supra.
Por otro lado, es preciso apuntar, además, lo que constituye una confesión y admisión para los efectos *873 del derecho contra la autoincriminación. Conocemos que la confesión es aquella manifestación oral o escrita de la co-misión del delito. Nevares-Muñiz, op. cit., pág. 36. Ello in-cluye la referencia al acto en sí y a todos sus elementos. Mientras, la admisión es una "manifestación sobre un he-cho específico o un eslabón de la prueba que tiende a esta-blecer la culpabilidad del acusado”. íd. Comenta la profe-sora Nevares-Muñiz que la admisión se distingue de la confesión en cuanto se refiere a cuestiones de hecho que no reflejan una culpabilidad completa. Id. La confesión, en vez, constituye el reconocimiento extrajudicial de culpabi-lidad que incluye aceptar la comisión de todos los elemen-tos del delito. Id.; Pueblo v. Viruet Camacho, supra.
Definidos los conceptos constitucionales y jurispruden-ciales sobre el arresto, la exclusión de evidencia y la auto-incriminación, pasemos a resolver la controversia que hoy nos ocupa.
III
El Ministerio Público aduce que el Tribunal de Apelacio-nes incurrió en error de derecho al determinar que la in-tervención de los agentes con el señor Pérez Rivera fue ilegal. Somos del criterio que le asiste la razón al Estado. Veamos.
A. Validez del arresto
Como mencionáramos antes, la conclusión de si hubo un arresto válido no depende de la admisión del agente que lo realiza, sino del análisis objetivo de todas las circunstan-cias que rodearon el arresto.
En el caso de autos, aunque el agente Grau no reconoció que realizó un arresto, debemos colegir que sí lo hizo. Ello cuando ordenó el traslado del recurrido al cuartel de la Policía. Esta conclusión se apoya, además, sobre el hecho de que no se le comunicó al recurrido que no tenía la obli-gación de ir con la Policía. Así también, debemos resaltar el *874 factor de que no le acompañó ningún familiar. Incluso, en el expediente nada refleja que el recurrido estuviera en la libertad de marcharse. Todo lo contrario; pasó la noche en urna celda en Arecibo. Ahora bien, concluido que en efecto hubo un arresto, debemos determinar si fue legal. Veamos.
Del testimonio del agente Grau surge que el 31 de diciembre de 2009 estaba investigando una escena donde ha-bía un cadáver con heridas cortantes en las manos y en otras partes del cuerpo. En ese momento, el agente razona-blemente entendía que se trataba de la escena de un asesinato. Posteriormente, durante su investigación, el hermano del occiso informó al agente que el señor Pérez Rivera tenía que estar involucrado en lo que le había ocu-rrido a la víctima y que sentía temor. Ello así, porque pre-viamente habían ocurrido incidentes entre el señor Váz-quez Sánchez y el acusado.(23)
Añádasele a lo anterior que, según se le informó al agente Grau, el señor Pérez Rivera fue quien alertó sobre la situación de que había una persona muerta. Es decir, sin que alguien tuviera conocimiento de que ocurrió un delito, el recurrido ya lo sabía. En relación con esto, el agente indicó, además, que el acusado fue inconsistente al indi-carle que había visto manchas de sangre en la puerta desde un lugar en donde el agente corroboró que no podían observarse.(24) Desde ese momento, el agente Grau tenía propio y personal conocimiento de que el acusado estaba mintiendo sobre información relacionada con la escena del crimen. Ante estos hechos, no podemos esperar que un hombre prudente y razonable no llegara a inferencias lógi-cas y razonables, y que creyera lo que nadie más estuviera dispuesto a creer bajo las mismas circunstancias. No se trata, pues, de una mera sospecha infundada e insustan-cial, sino de una suma de circunstancias a las que un *875 agente investigador tiene la responsabilidad de dar seguimiento. Es decir, el agente pudo observar el compor-tamiento sospechoso del señor Pérez Rivera. Además, en esa etapa contaba con los datos provistos por el hermano del occiso sobre los incidentes previos entre la víctima y el recurrido.
Los hechos de este caso son similares a los de Pueblo v. Alcalá Fernández, supra, donde la reacción espontánea de los testigos fue señalar exclusivamente al acusado como autor del crimen. Es pertinente apuntar que, según pauta-mos en Alcalá Fernández, al realizar un arresto sin orden lo vital es que exista un conjunto de circunstancias cuyo conocimiento constituya motivo fundado para que una persona corriente y razonable crea que el sospechoso cometió el acto delictivo. Es evidente que de la información pro-ducto de su investigación, el agente Grau tenía ante sí he-chos concretos que apuntaban al acusado como autor de los hechos. En vista de lo anterior, es forzoso colegir que el agente Grau no tenía ante sí meras sospechas.
La suma de todas estas circunstancias, sin lugar a du-das, establece en la mente de cualquier persona corriente y razonable un escenario de la comisión de un delito en el que el acusado probablemente estaba involucrado. En con-secuencia, la intervención con el recurrido fue razonable y estuvo revestida de las garantías constitucionales antes discutidas.
Por su parte, la determinación del Tribunal de Apelacio-nes en relación con la ilegalidad del arresto se basó en el raciocinio de Pueblo v. Colón Bernier, supra, de que las meras sospechas no son suficientes para establecer los mo-tivos fundados que justifican el arresto sin una orden judicial. Sin embargo, los hechos de ese caso son muy dis-tintos a la controversia que hoy nos ocupa. Se trataba allí de una confidencia de un evento delictivo próximo a ocurrir. No se relacionaba de manera alguna a las personas apuntadas en la comisión de un delito. Más bien, la infor- *876 marión dada al agente se refería únicamente a la presencia en un área residencial de unos individuos sospechosos. Por consiguiente, opinamos en aquel entonces que el arresto que ocurrió en Colón Bernier se fundó en una simple conjetura.
Esa “mera sospecha” rechazada en Colón Bernier está ausente en el caso objeto de nuestro análisis. Hoy encara-mos unos hechos en los que funcionarios del orden público tenían certeza de que ocurrió un delito grave, pues se en-contró un cadáver con evidentes signos de violencia. Así también, de la investigación realizada por los agentes de-velaron unas circunstancias que apuntaron al recurrido como el autor. No se trata aquí de circunstancias genera-les, sino de información concreta e individualizada de los hechos de la comisión de un asesinato y de la implicación de un individuo como el autor.
Insistimos y es meritorio distinguir el hecho de que el recurrido proveyó información desacertada y palpable-mente falsa como respuesta a las preguntas del agente Grau. El comportamiento sospechoso del acusado, sumado al hecho de que ocurrió una muerte violenta y las indica-ciones del hermano y del cuñado del occiso, son circunstan-cias suficientes para sostener la probabilidad razonable de que el acusado fue el autor del asesinato del señor Vázquez Sánchez.
Es incuestionable, a la luz de la totalidad de las circuns-tancias, que los agentes del orden público tenían motivos fondados para realizar el arresto sin una orden judicial. Reiteramos que el estándar para medir la causa probable para justificar un arresto es el de una persona “prudente y ordinaria”.(25) Sin lugar a dudas, ante este estándar y la *877 información producto de la investigación previa, era probable para una persona común que el recurrido estuviera in-volucrado directamente con los hechos delictivos. En con-secuencia, la actuación de la Policía de arrestar al recurrido en ese momento estuvo ampliamente justificada. Es evidente que, conforme los criterios establecidos en la Regla 11 de Procedimiento Criminal, supra, existían los motivos fundados para validar el arresto sin una orden judicial; ello incluso antes del interrogatorio realizado por el sargento Pérez.
Cónsono con lo expuesto, ante la pregunta de si un hombre ordinario y prudente, a la luz de toda esta información puede razonablemente creer que el recurrido asesinó al se-ñor Sánchez Vázquez, no queda otra respuesta que la afir-mativa: los motivos fundados estaban presentes previo al arresto. El que el agente Grau no admitiera que hizo un arresto no invalida la palmaria existencia de causa probable para el arresto del señor Pérez Rivera. Recordemos, pues, que la determinación de si hubo motivos fundados para arrestar sin una orden judicial previa no está condi-cionada a la creencia subjetiva del oficial que lo realizó. Las conclusiones personales del agente Grau en cuanto a que no arrestó al recurrido y que más bien lo dejó bajo custodia para su protección, no nos atan ni nos obligan a concluir que no hubo arresto y que no existían motivos fun-dados para hacer el arresto. LaFave, op. cit, pág. 37. Ello pues, precisamente, es función del juzgador aquilatar y ha-cer un análisis independiente de los hechos para llegar a su propia determinación sobre la existencia de causa probable.
Al considerar los antecedentes fácticos, opinamos que el arresto fue razonable y que cumplió con los parámetros constitucionales. Ello, pues no se trataba aquí de una mera *878 sospecha, sino de un conjunto de circunstancias que permi-tieron que los agentes del orden público creyeran que el señor Pérez Rivera le causó la muerte a la víctima. Según indicamos, el punto de partida fue el descubrimiento del cuerpo sin vida del señor Vázquez Sánchez. A ello se le sumó el producto de la investigación de los agentes —en términos de que el recurrido merodeaba la casa del occiso y que tenía problemas con este— más la versión inverosímil que el recurrido ofreció al agente Grau con respecto al incidente.
Los agentes de la Policía son los funcionarios responsa-bles de realizar distintas labores de seguridad pública y en el área de investigación criminal. Somos del criterio que son personas que pueden razonable y naturalmente inferir conclusiones sobre la cadena de evidencia que recopilan en una investigación. Además, el estándar de causa probable para arresto, según hemos establecido, no requiere certeza más allá de duda razonable de que se cometió un delito ni de que el imputado fue quien lo cometió.
Ante los hechos que hoy escrutamos, tanto el agente Grau como el sargento Pérez podían razonablemente cole-gir que, primero, hubo un asesinato y, segundo, que proba-blemente el recurrido estuvo vinculado con los hechos delictivos. Por ello, el segundo no dudó en admitir que sí había ocurrido un arresto. En este análisis sería absurdo requerirles a los funcionarios del orden público que reali-cen arrestos únicamente cuando presencien la comisión de un delito o cuando tengan la certeza indudable de su comi-sión y de su autor. Tal proceder sería derogar de facto la Regla 11(c) de Procedimiento Criminal, supra.
Colegimos, pues, que la determinación de lo que consti-tuye causa probable como hemos reiterado a lo largo de nuestra jurisprudencia se basa en las creencias que razo-nablemente pueda tener una persona “ordinaria y prudente”. Es necesario llevar este estándar a la práctica, abandonando así la posibilidad de abstraemos de la reali- *879 dad que tuvo ante sí el funcionario público que realizó el arresto.
B. Voluntariedad de la información provista sobre la ubi-cación del arma homicida y de la confesión
En la vista celebrada para determinar la procedencia de la supresión de evidencia, incluyendo las declaraciones del acusado del 31 de diciembre de 2009, el Ministerio Público presentó prueba testifical y documental en tomo a las cir-cunstancias que rodearon la misma. Según declaró el sar-gento Pérez, en esa fecha al acusado se le hicieron las ad-vertencias legales correspondientes antes de prestar su declaración. Esto es, se le advirtió de su derecho a no de-clarar, de su derecho a ser asistido de un abogado costeado por el Estado en caso de que el acusado no pudiera cos-tearlo y de que su declaración tenía que ser voluntaria. Asimismo, se le advirtió que en cualquier momento podía dejar de declarar y que todo lo que dijera podía ser usado en su contra. Fue luego de recibir las advertencias de ley que el señor Pérez Rivera procedió a dar su versión de los hechos, en la que incriminó a un tercero, conocido por “Chapo”, y reveló la ubicación del arma homicida.
Podemos colegir razonablemente que el acusado no ubicó el arma homicida movido por un sentimiento de com-pulsión proveniente de una detención ilegal; más bien, ello fue producto de un acto voluntar io.(26)
Así también, del legajo de autos surge igualmente que el sargento Pérez le hizo al recurrido las advertencias de rigor en varias ocasiones posteriores: antes de tomarle las huellas dactilares y antes de que el recurrido comenzara a hacer su confesión incriminatoria. Nuevamente, cuando se le va a tomar la declaración jurada, el Estado le hace las advertencias legales. La defensa alega que como el recu-rrido no sabía leer, tenía dieciocho años y, supuestamente, tenía un coeficiente intelectual inferior porque no sabía su *880 número de seguro social ni su fecha de nacimiento, este no podía entender los derechos que le fueron informados. No podemos avalar esas alegaciones. Es norma reiterada en nuestro ordenamiento jurídico que las meras alegaciones no constituyen prueba.
Primero, debemos aclarar que las manifestaciones que el recurrido realizó el 31 de diciembre de 2009 en el inte-rrogatorio que le hizo el sargento Pérez no constituyeron una confesión o admisión. En ese momento, el recurrido tuvo la suspicacia en ese momento de no incriminarse. Más bien, el recurrido involucró a un tercero y proveyó la infor-mación de que conocía dónde estaba el arma homicida. So-bre este extremo, el testimonio el sargento Pérez expresa:
Fiscal: ¿Qué más le informó?
Sargento: [E]l me indicó que esa muerte la había ocasionado un muchacho allí mismo del barrio conocido como Chapo. Que Chapo le había indicado que había sido él. Pero que no ... Fiscal: Disculpe.
Sargento: Pero sí, pero que a su vez, perdón Chapo le había manifestado que no le comentara a nadie que no lo chotiara [sic] po[rq]ue si no él lo iba a matar. Él a su vez me indicó que él había visto a Chapo, eso viene siendo un poquito más arriba de la residencia ....
Fiscal: ¿Qué alguna otra cosa le informó o qu[é] le indagó en ese momento de esa entrevista?
Sargento: Este, pues que si él estaba seguro de lo que me estaba indicando y [é]l me indicó que si que él sabía a su vez que donde estaba el arma que se utilizó en ese asesinato. Él me indicó que esa arma se había utilizado, el cuchillo estaba en la parte posterior cerca de otra residencia cerca de unas matas de plátano. Y que él estaba dispuesto a llevarme al lu-gar donde estaba. Durante esa noche nosotros pasamos al lu-gar pero de acuerdo a las condiciones del tiempo, el tiempo lluvioso la búsqueda como tal del arma utilizada se tuyo que suspender y al día siguiente pues volvimos con él .... (Énfasis nuestro). Transcripción de la prueba estipulada, Apéndice del recurso de certiorari, págs. 168-169.
Las manifestaciones incriminatorias se realizaron el 4 de enero de 2010, cuando el recurrido fue citado y asistió voluntariamente a que le tomaran sus huellas *881 dactilares.(27) Luego que se las tomaron, este espontánea-mente decidió confesar su delito. En esos instantes se le vuelven a realizar las “advertencias Miranda” y se le dio un documento para que confirmara que había sido infor-mado sobre ello.
El derecho a no incriminarse, según enfatizamos, es renunciable. Ello así siempre que tal renuncia sea inteli-gente y voluntaria, y no medie coacción o violencia por parte de los funcionarios del Estado. En este caso, la mera alegación de que el recurrido tenía un coeficiente intelec-tual menor no es razón para concluir que este no compren-dió las advertencias que le fueron comunicadas en varias ocasiones. Es preciso mencionar que el señor Pérez Rivera fue declarado procesable para atender a los rigores del pro-ceso criminal.(28) Además, su astucia al apagar los “breakers” de la casa de su víctima para que nadie lo viera, según confesó en su declaración jurada, revela que es una persona de sentido común promedio. Es forzoso deducir que no estamos aquí ante una persona sin malicia e inca-paz de comprender las consecuencias de sus acciones ni de la renuncia a sus derechos.
Asimismo, de la prueba vertida, la cual la parte recu-rrida reconoce en su alegato que el Tribunal de Primera Instancia creyó en su totalidad, surge que en todo mo-mento el recurrido se sintió cómodo y que no fue coaccio-nado ni amedrentado por los funcionarios del orden público para obtener información alguna. Este declaró que lo ha-bían tratado muy bien y que estaba tranquilo al momento de su confesión, la cual realizó voluntariamente(29)
Resultan de particular importancia las expresiones del recurrido en tomo a lo que manifestó a la Policía el 31 de diciembre de 2009:
*882 ¿El 31 de diciembre de 2009, qué Agente de Homicidios lo en-trevistó a usted?
Un agente bajito, fuerte, calvo. Él me hizo las advertencias de ley y me preguntó qué pasó. Yo le dije que había sido Chapo, que salió de la casa abandonada del cruce. Que tenía un pan-talón brown y una camisa blanca y que la camisa blanca es-taba llena de sangre y las manos también. Le dije que yo no tenía nada que ver con la muerte de Moncho, que yo llegué a mi casa temprano, a las 9 de la noche y me acosté a dormir con mi esposa. Que como a las 10 me desperté porque escuché a los perros ladrar. ... Yole dije al agente que yo sabía dónde estaba el cuchillo y al otro día yo los llevé al sitio y encontraron el cuchillo donde yo les había indicado.
En el día de hoy volvía a hablar con el agente de Homicidios en el cuartel de Morovis donde yo estaba citado y allí me leye-ron las advertencias nuevamente y le dije la verdad. Yo iba asustado y quería sacarme eso ya.
Lo que usted ha declarado en la tarde de hoy, ¿le pregunto si usted se reafirma en que es cierto?
Sí.
¿Cómo lo ha tratado la Policía?
Super bien, demasiado de cariñosos.
¿Cómo le ha tratado el fiscal?
Bien también.
¿Esta declaración que usted ha hecho hoy es libre y volunta-ria?
Sí.
¿Alguien le ha ofrecido algo a cambio de que usted declare aquí?
No. (Énfasis nuestro). Declaración Jurada del 4 de enero de 2010, Apéndice de la Petición de certiorari, págs. 69-70.
Evaluada la totalidad de las circunstancias, la cantidad de veces que se le advirtieron sus derechos constituciona-les, la actitud de colaboración en la búsqueda del cuchillo y la posterior confesión, concluimos que el recurrido renun-ció inteligentemente a su derecho contra la auto-incriminación.
Según surge de la transcripción de la vista de supresión, el recurrido fue liberado el 1 de enero de 2010. La defensa plantea en su alegato que el término de 36 horas estable-cido en Pueblo v. Aponte, supra, es para llevar a una persona arrestada sin una orden judicial ante un magistrado *883 para que determine si existe o no causa probable y no para investigar o buscar evidencia .contra el sospechoso. En cuanto a este extremo, opinamos que no hay obstáculo para que los agentes del orden público —como en este ca-so— urna vez tienen motivos fundados para arrestar a un individuo, así lo hagan. Más aún cuando el recurrido quiso indicar el paradero del arma utilizada en la comisión del delito y se dispuso para buscarla. (30) Debemos destacar que, mucho antes de recibir esa información por parte del recurrido, el Estado ya tenía motivos fundados para arrestarlo. Igualmente, es preciso puntualizar que el señor Pérez Rivera no estuvo más de 36 horas arrestado.
No podemos concluir que el arresto realizado fue una detención ilegal para la investigación. Según analizamos, la detención fue legal, propiciada por la existencia de mo-tivos fundados. Además, los agentes de la Policía tienen la potestad de llevar a cabo sus investigaciones con o sin la colaboración del detenido.
En este caso, el recurrido quiso colaborar con la obten-ción de la evidencia. Una vez delineados los límites proce-sales de índole constitucional, nada impide que el Estado vaya tras la evidencia que el sospechoso de la comisión del delito indica. Hacemos hincapié, además, que en ningún momento se sometió al recurrido a un interrogatorio conti-nuo que quebrara su voluntad. Tanto fue así, que este no confesó en ese momento y solo quiso voluntariamente indi-car dónde estaba el arma.
Establecido que el arresto fue legal y que todas las ma-nifestaciones posteriores al arresto fueron voluntarias, *884 concluimos que la regla de exclusión de evidencia es inapli-cable en este caso. En consecuencia, resuelto que el arresto fue legal, es innecesaria la discusión de la doctrina ati-nente a la exclusión de evidencia. El arresto fue razonable y, por consiguiente, el arma obtenida por las manifestacio-nes tras el arresto es admisible por no ser “fruto del árbol ponzoñoso”.
Más que sustituir el criterio del juez de instancia, hoy tenemos presente que al revisar una determinación de causa probable nos corresponde “estimar si la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable ...”. (Enfasis nuestro). Pueblo v. Muñoz, Colón y Ocasio, supra, pág. 984. En la realización de esa tarea, es preciso mantener en perspectiva, como reiteramos hoy, que la determinación de causa probable conlleva un análisis de probabilidad y no de certeza. “ ‘Estas no son cuestiones técnicas; se trata de con-sideraciones prácticas y reales que surgen en la vida coti-diana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho’ ”. (Enfasis suprimido), íd., pág. 980.
A la luz de todo lo anterior, es improcedente pretender elevar el criterio de razonabilidad y probabilidad a uno de certeza absoluta. Tal proceder atentaría contra la efectiva persecución de la actividad criminal a la que nuestro pueblo aspira.
IV
Por los fundamentos que anteceden, modificamos la sentencia del Tribunal de Apelaciones y resolvemos que el arresto del señor Pérez Rivera, realizado el 31 de diciembre de 2009, cumplió con los parámetros constitucionales que rigen el estado de derecho. En consecuencia, se revoca la parte del dictamen del foro apelativo intermedio que supri-mió el arma homicida. Por otro lado, confirmamos al foro a *885 quo en cuanto a la determinación de que la confesión rea-lizada el 4 de enero de 2010 y las expresiones del recurrido al agente Grau el 31 de diciembre de 2009 no deben ser suprimidas, puesto que fueron prestadas de forma libre, inteligente y voluntaria. Asimismo, ordenamos la devolu-ción del expediente de autos al foro primario para que con-tinúe con los procedimientos judiciales conforme con lo aquí resuelto.

Se dictará Sentencia de conformidad.

El Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Fiol Matta disintieron sin opinión escrita.

 Art. 106 del Código Penal, 33 L.P.R.A. sec. 4734.

 Véase Apéndice de la Petición de certiorari, pág. 48.

 Véase Moción en oposición a solicitud de supresión de evidencia y otros ex-tremos, Apéndice de la Petición de certiorari, pág. 61.

 Íd.

 La declaración jurada fue admitida como exhibit el día de la vista de supre-sión de evidencia. Véase la transcripción estipulada de la vista de supresión de evi-dencia, Apéndice de la Petición de certiorari, págs. 167-168.

 Transcripción estipulada de la vista de supresión de evidencia, Apéndice de la Petición de certiorari, pág. 154.

 Íd., pág. 155.

 Íd., pág. 156.

 Íd.

 Íd., pág. 164.

 Íd., pág. 167.

 Íd., pág. 175.

 Íd., pág. 170.

 Íd. págs. 170 y 172. Surge de la transcripción de la prueba que el recurrido quedó citado para la toma de huellas dactilares.

 Transcripción estipulada de la vista de supresión de evidencia, Apéndice de la Petición de certiorari, pág. 172.

 Apéndice de la Petición de certiorari, pág. 67.

 American Psychological Services Health Care (APS) es una compañía de manejo coordinado de salud mental del Plan de Salud de Puerto Rico.

 Apéndice de la Petición de certiorari, pág. 70.

 La minuta —que tampoco está firmada por el juez que presidió la vista— no alude concretamente a la evidencia que se suprime. Basándonos en la solicitud de supresión, se colige que se suprimieron las manifestaciones, las huellas y los resul-tados aludidos. Debemos destacar que, según la pauta de Pueblo v. Moreno Valentín, 168 D.P.R. 233 (2006), corresponde al Tribunal de Apelaciones determinar si la mi-nuta que recoge la decisión judicial del foro primario es suficiente para permitirle cumplir su función revisora. En el caso de autos, el foro a quo no ordenó al tribunal de instancia a que fundamentara su decisión de suprimir la evidencia, pero sí contó con la transcripción estipulada de la vista de supresión de evidencia.

 Específicamente, el texto pertinente de la Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, señala lo siguiente:
“Cualquier persona que hiciere un arresto sin orden de arresto deberá llevar a la persona arrestada sin demora innecesaria ante el magistrado disponible más cer-cano, y si la persona que hiciere el arresto sin orden de arresto fuere una particular, podrá entregar a la persona arrestada a cualquier funcionario del orden público, *861 quien a su vez deberá llevar a la persona arrestada sin demora innecesaria ante un magistrado, según se dispone en esta regla. Cuando se arrestare a una persona sin que se hubiere expedido orden de arresto y se le llevare ante un magistrado, se seguirá el procedimiento que disponen las Reglas 6 y 7, según corresponda”.

 Específicamente, el Tribunal Supremo de Estados Unidos ha pautado lo siguiente:
*868 “ ‘Probable cause exists where ‘the facts and circumstances within their [the officers’] trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that’ an offense has been or is being committed by [the person to be arrested]’ (Corchetes en el original). United States v. Salinas-Calderon, 728 F.2d 1298, 1300 (10mo Cir. 1984), citando a Brinegar v. United States, 338 U.S. 160, 175-176 (1949).

 En el contexto de la controversia que nos ocupa, resultan de particular importancia las expresiones siguientes:
“The test for probable cause is clear: probable cause exists if facts and circumstances within the knowledge of an arresting officer and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an individual has committed a crime. The facts, information and circumstances within the knowledge of the arresting officers need not amount to evidence which would suffice to convict; but the quantum of information which constitutes probable cause —evidence which would warrant a man of reasonable caution in the belief that a felony had been committed— must be measured by the facts of the particular case. The fact that the Sheriff testified that the defendant was not under arrest or in custody is not conclusive on that issue”. (Enfasis nuestro y citas omitidas). Cox v. State, 489 So. 2d 612, 620-21 (Ala. Crim. App. 1985).

 Transcripción estipulada de la vista de supresión de evidencia, Apéndice de la Petición de certiorari, págs. 155-156.

 Íd.

 Resultan de particular relevancia las siguientes expresiones emitidas por el Tribunal Superior del estado de Nueva Jersey:
“Probable cause is defined as a reasonable basis for a belief that a crime has been or is being committed. Probable cause is a mercurial concept incapable of precise definition. ‘It is more than mere naked suspicion but less than the legal evidence necessary to convict ... it is not a technical concept but rather one having to do with *877 ‘the factual and practical considerations of everyday life’ upon which reasonable men, not constitutional lawyers, act”. (Citas omitidas y énfasis nuestro). State v. Gavazzi, 332 N.J. Super. 348, 354; 753 A.2d 746, 750 (Ch. Div. 2000).

 Véase U.S. v. Stark, 499 F.3d. 72 (2007).

 Transcripción estipulada de la vista de supresión de evidencia, Apéndice de la Petición de certiorari, pág. 172.

 Véase Apéndice de la Petición de certiorari, pág. 61.

 Íd., pág. 70.

 Distinguimos los hechos de las expresiones en County of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991), donde se indicó que un ejemplo de una demora irrazonable es en la que se incurre para recopilar evidencia adicional que justifique el arresto. En los hechos ante nuestra consideración, el arresto se justificó desde sus inicios. La obtención del cuchillo no era necesaria para justificar el arresto. Más bien, el recurrido quiso indicar dónde estaba el arma y voluntariamente llevar a los agen-tes del orden público a encontrarla. Además, el recurrido fue liberado antes de que se cumpliera el término de 36 horas adoptado en Pueblo v. Aponte, 167 D.P.R. 578 (2006), y luego fue citado para que compareciera a la toma de huellas digitales el 4 de enero de 2010.